T.C. Memo. 2008-63

UNITED STATES TAX COURT

JOSEPH D. DUNNE AND ELIZABETH M. DUNNE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24666-05.                Filed March 12, 2008.

<u>Steven D. Simpson</u>, for petitioners.

<u>J. Craig Young</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' 1997 and 1999 Federal income taxes of $822,298 and
$2,566, respectively, and additions to tax under section

6651(a)(1)[1] of $205,028.25 and $592.50, respectively, for 1997 and 1999.  After concessions,[2] the issues for decision are:

(1)  Whether respondent bears the burden of proof under section 7491(a).  We hold that respondent does not;

(2)  whether petitioner Joseph Dunne was a shareholder of FRC International, Inc. (FRC), in 1997 and whether petitioners must pay income tax on FRC's income under section 1366.  We hold that Mr. Dunne ceased to be a shareholder of FRC on May 8, 1997, and therefore under section 1377(a)(1) petitioners are liable for paying income tax only on Mr. Dunne's pro rata share of FRC's income on the basis of the number of days in 1997 that he owned the stock;

(3)  whether Mrs. Dunne is eligible for relief from joint liability under section 6015 for 1997.  We hold that she is not;

(4)  whether petitioners may claim as trade or business expenses $20,000 of legal expenses that they incurred in 1999. We hold that they may not, but they may claim the $20,000 as miscellaneous itemized expenses;

---

[1] All section references are to the Internal Revenue Code (the Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Petitioners concede that the statute of limitations does not bar the assessment or collection of any amount due for 1997 or 1999.  Petitioners also concede that petitioner Elizabeth Dunne does not qualify for innocent spouse relief under sec. 6015 for 1999.

(5) whether petitioners failed to report a $15,000 capital gain on their 1999 Federal income tax return. We hold that they did not, because we find that respondent's determination as to this item was arbitrary; and

(6) whether petitioners are liable for additions to tax under section 6651(a)(1) for 1997 and 1999. We hold that they are.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated herein by this reference.

Petitioners resided in Sanford, North Carolina, at the time they filed their petition.

FRC International, Inc.

Mr. Dunne incorporated FRC in Delaware in 1982. FRC's principal place of business was Holland, Ohio. FRC was in the business of selling fire protection material, particularly a chemical called halon, through contracts with the Federal Government. FRC was an S corporation for all relevant periods.

Mr. Dunne was FRC's sole shareholder from the time of its incorporation until 1993. Mr. Dunne was also a director and an employee of FRC. In 1993, Richard Marcus became a 50-percent shareholder of FRC while Mr. Dunne continued to own the remaining 50 percent. Mr. Marcus also became the president of FRC and

remained in that position at all relevant times. Mr. Dunne and Mr. Marcus were also coguarantors of a $4 million line of credit from FRC's bank that was set up in connection with a particular contract that FRC had to provide halon to the Government (the halon contract).

FRC did not hold any formal shareholder or board of directors meetings during any relevant period. Before 1997 Mr. Dunne was living in North Carolina, and he flew to FRC's office in Holland, Ohio, every 1 or 2 months. Mr. Dunne exercised only limited managerial control over FRC at that time.

Problems Between Mr. Dunne and Mr. Marcus

Mr. Dunne and Mr. Marcus began to have disagreements about the operation of FRC in 1995. They discussed possible buyout arrangements--some where Mr. Marcus would buy Mr. Dunne's shares and some where the reverse was true.

On August 1, 1996, Mr. Dunne and Mr. Marcus met at the Inverness Country Club. At this meeting, Mr. Dunne agreed informally to sell Mr. Marcus or FRC his FRC stock on an unspecified later date, but they anticipated the sale would occur by December 31, 1996 (the Inverness agreement). The price was to be based upon an independent valuation of FRC. Mr. Dunne agreed that Mr. Marcus could conduct the business of FRC as he wished. Mr. Dunne and Mr. Marcus did not make a binding agreement or sign a contract at this time, and no sale occurred in 1996.

On January 16, 1997, through their respective attorneys, Mr. Marcus made an offer to Mr. Dunne, which was based on the Inverness agreement and subsequently would end the relationship between Mr. Dunne and FRC. Mr. Dunne did not accept this offer.

By letter dated January 24, 1997, as president of FRC, Mr. Marcus terminated Mr. Dunne's employment as of January 25, 1997. Mr. Marcus wrote that he understood that Mr. Dunne would continue to be an FRC shareholder and a member of the board of directors. Mr. Dunne was not involved in the management or operation of FRC after this date.

On February 3, 1997, Mr. Marcus e-mailed FRC's employees directing them not to discuss FRC's business with or provide information to Mr. Dunne but to refer such calls to him.

On February 26, 1997, Mr. Dunne filed a Verified Petition for Appointment of a Custodian against FRC in the Chancery Court of New Castle County, Delaware, pursuant to section 226 of Delaware's general corporate law. That section allows shareholders of a corporation to have a custodian appointed for that corporation in certain circumstances. In his petition, Mr. Dunne stated that he was a 50-percent owner, the chairman of the board, and the secretary of FRC. Mr. Dunne also stated that he and Mr. Marcus did not reach an agreement at the Inverness Country Club meeting.

On March 18, 1997, Mr. Marcus mailed a letter to a potential business partner.  Mr. Marcus wrote:  "As of January 25, 1997 Joe Dunne was terminated as an employee of FRC, therefore he does not speak for or represent the company in anyway.  In addition, it is our position that Joe has in effect sold his shares of stock to me."

The Settlement Agreement

On May 8, 1997, Mr. Dunne and Mr. Marcus executed a settlement agreement.  This agreement provided that in exchange for his 50-percent interest in FRC, Mr. Dunne would receive $175,000 plus 50 percent of FRC's total net profit from the halon contract.  The parties agreed that the payment of $175,000 represented FRC's net book value.  The settlement agreement provided that the $175,000 was payable as of the date of settlement (the settlement date), but also that it was payable in seven equal monthly payments beginning on June 1, 1997.

Regarding Mr. Dunne's FRC stock, the settlement agreement provided:

> TO BE DELIVERED IN ESCROW FULLY ENDORSED PENDING FINAL
> DISTRIBUTION OF ALL MONIES DUE UNDER HALON CONTRACT &
> TWO ESCROW ACCTS, OR PAYMENT OF NET B.V. OF FRCI,
> WHICHEVER IS LATER.  NO SHAREHOLDER OR DIRECTOR RIGHTS
> IN JDD AFTER DATE OF SETTLEMENT.  ESCROW ACCT PROCEEDS
> TO BE DISTRIBUTED NET OF ALL COSTS & EXPENSES 1/2 TO
> JDD & 1/2 TO RMM.

*     *     *     *     *     *     *

SETTLEMENT DATE IS DATE OF SIGNING MEMORIALIZING DOCUMENT, ANTICIPATED TO BE COMPLETE NOT LATER THAN 5/16/97.

However, contrary to the agreement, Mr. Dunne did not escrow his FRC stock certificates at that time. The settlement agreement also provided that all disputes were to be resolved by arbitration.

Soon after they executed the settlement agreement, Mr. Dunne and Mr. Marcus began disputing its provisions. On October 7, 1997, Mr. Dunne, Mr. Marcus, and FRC executed an agreement to arbitrate these disputes.

Mr. Dunne's Relationship With FRC

FRC paid Mr. Dunne and Mr. Marcus equal dividends each month from January through April of 1997, totaling between $20,000 and $26,000 for each. FRC paid these dividends so that Mr. Dunne and Mr. Marcus could satisfy their income tax liabilities.

In September of 1997, Mr. Dunne sent several letters and reports regarding FRC to FRC's bank, listing his titles as "Director, Officer, Co-Owner of FRC, Int'l." An officer of the bank replied with correspondence acknowledging Mr. Dunne's titles.

On October 6, 1997, the bank's attorney sent Mr. Dunne a letter stating that the bank was aware of Mr. Dunne's agreement to sell his interest in FRC and of the dispute between Mr. Dunne and Mr. Marcus. Because the bank did not know what authority Mr.

Dunne had concerning FRC's affairs and did not wish to be a party to the dispute, it informed Mr. Dunne through counsel that it would provide Mr. Dunne with further financial information only upon the request of FRC through its president.

Mr. Dunne responded in a letter dated October 8, 1997, in which he asked the bank's attorney for documentation showing that he was not a director, officer, and coowner of FRC and therefore not entitled to receive copies of FRC's financial information from the bank. Mr. Dunne also sent a letter to the bank reasserting his position as a director, officer, and coowner of FRC and asking for the documentation that the bank relied upon to determine that he no longer held those positions. The attorney for the bank responded by a fax dated October 15, 1997, that it received no document indicating that Mr. Dunne was no longer a director, officer, or coowner of FRC but that out of caution it would like FRC's president to be aware of Mr. Dunne's requests for FRC's financial information. Mr. Dunne sent several more letters to both the bank's attorney and the bank asserting his position as a director, officer, and coowner of FRC.

On April 15, 1998, Mr. Dunne wrote to an FRC employee requesting copies of FRC's Form 1120S, U.S. Income Tax Return for an S Corporation, and Mr. Dunne's Schedule K-1, Shareholder's Share of Income, Credits, Deductions, etc., for 1997. Mr. Dunne stated that he understood that FRC's taxable income for 1997

would be about $4.3 million.  Mr. Dunne also requested that FRC continue its practice of depositing Mr. Dunne's estimated tax liability directly with respondent.  He did not believe that this would be a problem because FRC had over $3 million in cash.  Mr. Dunne signed this letter as "Co-Owner and Chairman of the Board" of FRC.

On September 21, 1998, FRC filed a Form 1120S for 1997 and attached Schedules K-1 for Mr. Dunne and Mr. Marcus.  The Schedules K-1 reported Mr. Dunne's and Mr. Marcus's shareholder percentages for 1997 to be 50 percent each and reported their pro rata shares of FRC's income and loss as $2,116,600 of ordinary income, $27,504 of interest income, and $1,953 of capital loss.  FRC sent Mr. Dunne a Schedule K-1 for 1997 identical to the Schedule K-1 it submitted to respondent.

The Arbitration Award

In October of 1997, Mr. Marcus offered to pay Mr. Dunne $2.2 million in full satisfaction of all payments required by the settlement agreement.  Mr. Dunne responded with a $2.6 million counteroffer, which he withdrew.  Mr. Dunne decided to let the arbitrator decide on the award because he thought he was entitled to receive about $4.9 million under the settlement agreement.

The arbitrator entered an arbitration award (the arbitration award) on June 8, 1998.  The arbitrator determined that Mr. Dunne's share of the halon contract was $511,267.54, which was

payable on the settlement date. Mr. Dunne was also entitled to $175,000 for the sale of his FRC stock on the settlement date. The arbitrator confirmed that the paragraph governing the transfer of FRC stock required Mr. Dunne to escrow the stock certificates on the settlement date, and that the certificates would be held in escrow until Mr. Dunne had received the money owed to him. The arbitrator noted that there was no settlement date at that point because no memorializing document had been signed. He directed that the settlement date would be June 22, 1998.

None of the parties involved complied with the arbitration award. On June 9, 1998, FRC and Mr. Marcus filed a complaint in the Court of Common Pleas of Lucas County, Ohio, to confirm the arbitration award. The complaint was removed to the U.S. District Court for the Northern District of Ohio. On August 10, 1998, Mr. Dunne filed an answer and counterclaim in which he stated that he was a 50-percent shareholder of FRC. On May 6, 1999, the District Court confirmed the arbitration award. All parties involved appealed.

Petitioners' Returns

On September 1, 1999, petitioners jointly filed a Form 1040, U.S. Individual Income Tax Return, for 1997. After an extension, petitioners' 1997 Form 1040 was due on August 15, 1998. Petitioners attached a Form 8082, Notice of Inconsistent

Treatment or Administrative Adjustment Request, to their 1997 return stating that they were not reporting the income or losses listed on the Schedule K-1 from FRC. They explained that Mr. Dunne filed a shareholder complaint regarding several issues: (1) That Mr. Dunne was a 50-percent shareholder of FRC but was frozen out of dividend distributions in 1997; (2) that FRC did not provide Mr. Dunne with certain information; (3) that Mr. Dunne was disengaged from FRC's books, records, and resolutions; and (4) that FRC may have made an unequal distribution of income earned in 1997 that could require a revocation of its S corporation status.

On September 17, 1999, FRC filed a Form 1120S for 1998 and attached Schedules K-1 for Mr. Dunne and Mr. Marcus. The Schedules K-1 reported that Mr. Dunne owned 23.69863 percent of the stock and Mr. Marcus owned the rest. In computing the ownership percentages shown on the 1998 Schedules K-1, FRC's accountants assumed that Mr. Dunne and Mr. Marcus each owned 50 percent of FRC's stock until June 22, 1998, and that Mr. Marcus became the sole shareholder after that date. FRC reported a net loss in 1998.

FRC sent Mr. Dunne a Schedule K-1 for 1998 identical to the Schedule K-1 that it submitted to respondent. In response to receiving his Schedule K-1 for 1998, on September 22, 1999, Mr. Dunne faxed a letter to FRC's accountants stating that the

Schedule K-1 was incorrect because Mr. Dunne still owned 50 percent of FRC.

On August 14, 2001, petitioners jointly filed a Form 1040 for 1999. This return was due on April 15, 2000.

The Transfer of Legal Title

On October 30, 2000, Mr. Dunne, Mr. Marcus, and FRC entered into an agreement and release of claims to settle all disputes between them. Pursuant to the agreement, Mr. Dunne endorsed and delivered his FRC stock certificates to Mr. Marcus, and Mr. Marcus and FRC paid Mr. Dunne the balance of the funds due to him under the arbitration award.

Respondent's Examination

In mid-2001 the Internal Revenue Service (IRS) began examining petitioners' 1997, 1998, and 1999 Federal income tax returns. Petitioners provided the examining agent with a large number of documents. Petitioners also gave the examining agent a summary of their position, which concluded that Mr. Dunne transferred beneficial ownership of his FRC shares on May 8, 1997. In her April 15, 2002, examination report the examining agent concluded that petitioners had deficiencies of $822,298 and $2,566 for 1997 and 1999, respectively. The examining agent also concluded on the basis of the arbitration award that the settlement date for the stock sale was June 22, 1998; thus petitioners were required to include all of the amounts reported

on Mr. Dunne's Schedule K-1 on their 1997 tax return. Furthermore, petitioners were liable for additions to tax under section 6651(a)(1) and (2) for 1997 and 1999.

On August 18, 2005, Mrs. Dunne sent to respondent a Form 8857, Request for Innocent Spouse Relief, for the year 1997. Mrs. Dunne stated that she signed the 1997 return but did not review it because there had never been a problem previously. Mrs. Dunne knew that her husband was selling his interest in a corporation and was concerned about what the effect of the litigation regarding the sale would be. When she told her husband about her concerns, Mr. Dunne responded that he was handling the sale according to his attorney's written advice, which was that Mr. Dunne had sold his interest in the corporation and petitioners did not need to report the income listed on the Schedule K-1. Because it was a complicated transaction, Mrs. Dunne relied on Mr. Dunne and his attorney, and Mrs. Dunne was not involved in the corporation at all.

Mrs. Dunne listed her average monthly household income as $5,157 and expenses as $4,971.87. Petitioners were married and living together at all relevant times, and Mrs. Dunne did not suffer any spousal abuse or poor mental or physical health at any relevant time. Mrs. Dunne has no knowledge of tax law except that income tax returns are due on April 15.

On October 7, 2005, respondent mailed petitioners a statutory notice of deficiency for 1997 and 1999. Respondent determined that Mr. Dunne remained a 50-percent shareholder of FRC throughout 1997 and that petitioners should have reported Mr. Dunne's pro rata share of FRC's items of income and loss as shown on the Schedule K-1 for 1997.

Regarding 1999, respondent determined that $20,000 of legal expenses that petitioners claimed as a deduction on their Schedule C, Profit or Loss From Business, should be disallowed. However, this amount should be included as a miscellaneous itemized deduction on petitioners' Schedule A, Itemized Deductions. These legal expenses related to Mr. Dunne's disputes over the settlement agreement. Respondent further determined that petitioners realized, but failed to report on their 1999 return, a $15,000 capital gain. However, there is no evidence in the record as to the source of this alleged capital gain.

Respondent stated that Mrs. Dunne was not entitled to relief from joint liability under section 6015 for either 1997 or 1999.[3]

Finally, respondent determined that petitioners were liable for additions to tax for failure to file timely income tax returns for both 1997 and 1999.

_____

[3] Respondent found that there were no grounds to grant Mrs. Dunne relief for tax year 1999 because she did not submit a Form 8857 for that year, and Mrs. Dunne has conceded this issue.

Petitioners timely petitioned this Court to redetermine all of respondent's adjustments.

OPINION

## I.  Burden of Proof

Petitioners contend that under section 7491(a), respondent bears the burden of proof relating to all items in the notice of deficiency.  Petitioners also contend that respondent's determinations relating to 1999 are arbitrary and capricious, but we will address that issue separately with respect to those items.

As a general rule, taxpayers bear the burden of proving that the Commissioner's determinations are incorrect.  Rule 142(a).  However, section 7491(a) may in specific circumstances place the burden on the Commissioner with regard to any factual issue relating to a taxpayer's liability for tax if the taxpayers produce credible evidence with respect to that issue and meet the requirements found in section 7491(a)(2).  The requirements applicable here are that the taxpayers have (1) complied with all substantiation requirements of the Code, (2) maintained all required records, and (3) cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews.  The taxpayers bear the burden of proving that they have met the requirements of section 7491(a)(2).  Miner v.

Commissioner, T.C. Memo. 2003-39; Nichols v. Commissioner, T.C. Memo. 2003-24, affd. 79 Fed. Appx. 282 (9th Cir. 2003).

Petitioners raised the issue of whether section 7491(a) applies for the first time in their posttrial brief. Respondent argues that he would be prejudiced if we were to allow petitioners to raise the section 7491(a)(2) requirements issue for the first time on brief because had they raised the issue earlier, respondent could have presented evidence showing that petitioners have not satisfied the requirements. We agree with respondent. See Smith v. Commissioner, T.C. Memo. 2007-368; Deihl v. Commissioner, T.C. Memo. 2005-287. Furthermore, other than the testimony of the examining agent that petitioners provided her with a lot of information, the record contains no specific evidence that petitioners have complied with all of the substantiation and record maintenance requirements or cooperated with respondent's information requests. Therefore, the record is insufficient for us to find that petitioners have satisfied the requirements of section 7491(a)(2), and we conclude a shift of the burden of proof is not appropriate in this case.

II.  Whether Petitioners Must Pay Income Tax on FRC's Income for 1997

Petitioners argue that they are not required to pay income tax on any of FRC's income or loss for 1997 because collateral estoppel prevents respondent from taxing petitioners in an amount in excess of what they received from the arbitration award and

because Mr. Dunne was not a beneficial owner of FRC for any part of 1997.

The doctrine of collateral estoppel provides that once an issue of fact or law is "actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153 (1979); Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979). For collateral estoppel to apply, the following five conditions must be satisfied:

(1) The issue in the second suit must be identical in all respects to the one decided in the first suit;

(2) there must be a final judgment rendered by a court of competent jurisdiction;

(3) collateral estoppel may be invoked against parties and their privies to the prior judgment;

(4) the parties must actually have litigated the issue and the resolution of the issue must have been essential to the prior decision; and

(5) the controlling facts and applicable legal rules must remain unchanged from those in the prior litigation. Brotman v. Commissioner, 105 T.C. 141, 148 (1995); Peck v. Commissioner, 90 T.C. 162, 166-167 (1988), affd. 904 F.2d 525 (9th Cir. 1990).

Collateral estoppel does not apply against respondent in this case. Collateral estoppel may be invoked against parties and their privies to the prior judgment, but respondent was not a party to the arbitration or a privy of Mr. Dunne, Mr. Marcus, or FRC. While petitioners correctly point out that the Supreme Court held in Parklane Hosiery Co. v. Shore, supra at 332-333, that collateral estoppel can apply where a party to the second proceeding was not a party to the first proceeding, they misunderstand the scope of that rule. The U.S. Supreme Court approved the use of collateral estoppel, whether mutual or nonmutual, in cases where the party against whom collateral estoppel is asserted has litigated and lost in the prior proceeding. Id. at 329. Therefore, even assuming respondent could have asserted that collateral estoppel applied against petitioners in this case if all of the other conditions had been satisfied, the reverse is not true.

Furthermore, neither the tax consequences of the settlement agreement nor Mr. Dunne's shareholder status were issues in the arbitration. The arbitration merely dealt with the terms of the settlement agreement, and the settlement agreement contained no terms relating to the settlement agreement's tax consequences except that it provided that Mr. Dunne would have no shareholder rights after the settlement date. Because petitioners are arguing that Mr. Dunne ceased to be a shareholder of FRC for

Federal income tax purposes before the settlement date of June 22, 1998, we assume that petitioners' argument is only that the amount of the arbitration award would somehow be relevant to Mr. Dunne's shareholder status or the amount of FRC's income that is taxable to petitioners. However, this is incorrect because the amount that Mr. Dunne was entitled to receive from the arbitration award is irrelevant for determining his shareholder status or tax liability. See Chen v. Commissioner, T.C. Memo. 2006-160; Knott v. Commissioner, T.C. Memo. 1991-352. The amount that Mr. Dunne received from the arbitration award may be relevant for the purpose of determining Mr. Dunne's basis in his FRC stock, but that matter is not at issue in this case.

Petitioners also argue that they are not liable for tax on FRC's income in 1997 because Mr. Dunne was not the beneficial owner of his FRC shares in 1997, and for that reason alone his 1997 Schedule K-1 is incorrect. Petitioners do not dispute that FRC had a valid S corporation election in effect in 1997, that the amount of FRC's income and loss reported on its Form 1120S is correct, or that the total amount of income and loss reported on the Schedules K-1 is consistent with FRC's Form 1120S.

Section 1366(a)(1) provides that in determining the income tax liability of an S corporation shareholder, the shareholder shall take into account his pro rata share of the S corporation's items of income, loss, deduction, and credit (tax items) for the

S corporation's taxable year ending with or in the shareholder's taxable year. The S corporation's income is taxable to the shareholder regardless of whether any income is distributed. Chen v. Commissioner, supra; Knott v. Commissioner, supra.

Section 1377(a)(1) allocates each item of an S corporation's income or loss pro rata on a per share per day of ownership basis. If a shareholder sells his stock during the S corporation's taxable year, he must take into account his pro rata share of the total amount of the S corporation's tax items according to the number of days in that year that he held his stock, regardless of whether the tax items arose before or after the sale. Sec. 1377(a)(1). The shareholders may elect to compute the selling shareholder's pro rata share of the tax items as if the S corporation's taxable year ends on the date the shareholder's ownership interest terminates, but the FRC shareholders did not make such an election. Sec. 1377(a)(2).

It is well settled that beneficial ownership, not legal title, determines stock ownership for Federal income tax purposes. Ragghianti v. Commissioner, 71 T.C. 346, 349 (1978), affd. 652 F.2d 65 (9th Cir. 1981); Pacific Coast Music Jobbers, Inc. v. Commissioner, 55 T.C. 866, 874 (1971), affd. without published opinion 457 F.2d 1165 (5th Cir. 1972). Therefore, we must determine whether Mr. Dunne was the beneficial owner of any of FRC's stock during 1997.

To determine when beneficial ownership has passed from one person to another, a court generally must determine at what point the transferee acquires more attributes of ownership than the transferor. Ragghianti v. Commissioner, supra at 349; Pacific Coast Music Jobbers, Inc. v. Commissioner, supra at 874; Cordes v. Commissioner, T.C. Memo. 1994-377. Where there is a written agreement that is intended to result in the sale of stock but provides for the transfer of legal title at a later date, we will consider whether that agreement suffices to transfer "substantially all" of the accouterments of ownership at the time of its execution. Ragghianti v. Commissioner, supra at 349; Pacific Coast Music Jobbers, Inc. v. Commissioner, supra at 874. However, if a taxpayer has entered into an unambiguous written agreement providing that a sale of stock is to occur at a specific date, the taxpayer must provide "strong proof" that beneficial ownership of the stock occurred at a time other than the date set in the agreement. Danenberg v. Commissioner, 73 T.C. 370, 391-392 (1979); Lucas v. Commissioner, 58 T.C. 1022, 1032 (1972).

Petitioners argue that Mr. Dunne was not a shareholder of FRC at any time during 1997 because the Inverness agreement, which petitioners claim was merely memorialized by the settlement agreement, transferred beneficial ownership of Mr. Dunne's shares to Mr. Marcus no later than December 31, 1996. We disagree.

When beneficial ownership of stock is transferred, with or without legal title, the transfer generally occurs pursuant to an agreement between the transferor and the transferee. Reitz v. Commissioner, 61 T.C. 443, 447 (1974), affd. 507 F.2d 1279 (5th Cir. 1975). Petitioners argue that "Mr. Dunne was stripped of his beneficial ownership rights" in FRC after the Inverness agreement, but they have not cited any cases, nor are we aware of any, where one shareholder was able to take beneficial ownership of stock away from another shareholder absent an agreement between the two shareholders or a provision in the corporation's governing articles to that effect. On the contrary, we have held that when one shareholder merely interferes with another shareholder's participation in the corporation as a result of a poor relationship between the shareholders, such interference does not amount to a deprivation of the economic benefit of the shares. Hightower v. Commissioner, T.C. Memo. 2005-274, affd. without published opinion 2008-1 USTC par. 50,185 (9th Cir. 2008).

We do not believe that the Inverness agreement gave Mr. Marcus any rights to Mr. Dunne's stock either by December 31, 1996, or on some other date. Clearly, Mr. Dunne and Mr. Marcus intended a sale to occur at some point, but they did not set any concrete terms or make any binding agreement. It is apparent from the testimony that the Inverness agreement was merely an

agreement to make a more formal agreement at a later date.  It appears that Mr. Marcus attempted to memorialize this by extending a settlement offer in his January 16, 1997, letter to Mr. Dunne, but Mr. Dunne did not accept that offer.

The other facts and circumstances also indicate that the Inverness agreement did not transfer any accouterments of owning Mr. Dunne's shares to Mr. Marcus.  While Mr. Dunne told Mr. Marcus that he could conduct business as he wished at the Inverness meeting, Mr. Marcus appears to have already had that power as president of FRC.  Furthermore, Mr. Dunne was not exercising significant managerial control before 1997.  In addition, after the Inverness agreement, Mr. Dunne continued to receive dividends from FRC and he continued to enjoy the benefits and burdens of being a shareholder because he had not fixed a selling price for his shares.  Mr. Dunne also exercised his right as a shareholder to petition for appointment of a custodian for FRC in a State court.  Finally, Mr. Dunne repeatedly asserted to FRC and third parties that he continued to be a shareholder of FRC after 1996.  Therefore, we find that Mr. Dunne retained beneficial ownership of FRC for at least part of 1997.

We next consider whether the May 8, 1997, settlement agreement transferred beneficial ownership of Mr. Dunne's stock

to Mr. Marcus.[4]  The parties do not dispute that the settlement agreement, unlike the Inverness agreement, was a valid and legally enforceable contract under which Mr. Dunne agreed to sell his FRC stock.  However, because the settlement agreement did not terminate Mr. Dunne's interest in FRC until the settlement date, which in 1997 was still some unspecified date in the future, we must consider whether Mr. Marcus nonetheless possessed substantially all of the accouterments of ownership by May 8, 1997.

The key provisions of the settlement agreement are that in exchange for his stock Mr. Dunne would receive the book value of FRC, set at $175,000, and half of the profit from the halon contract.  Mr. Dunne's FRC stock would be held in escrow until he received his share of the halon contract and the book value of his stock.  The settlement agreement also provided that Mr. Dunne would have no shareholder or director rights after the settlement date, which was to be the date of signing a memorializing document anticipated to be no later than May 16, 1997.

Respondent argues that because the settlement agreement expressly provided that Mr. Dunne would hold no shareholder

---

[4] While respondent argues that petitioners have abandoned this alternative argument because they did not argue it in their posttrial brief, we believe that it is in the best interest of justice to consider this alternative argument.  During the trial, we raised the issue of whether it was appropriate to consider the settlement date as the date of sale, and respondent addressed this issue on brief.

rights after the settlement date, Mr. Dunne would retain beneficial ownership of his shares until the settlement date, and therefore petitioners must come forward with "strong proof" to contradict this language.  While we agree that respondent's interpretation of this language is plausible, we find that this language is ambiguous and therefore petitioners need not refute it with "strong proof".  See Danenberg v. Commissioner, 73 T.C. at 391-392; Lucas v. Commissioner, 58 T.C. at 1032.  It is undisputed that Mr. Dunne retained the right to keep legal title to the stock after he signed the settlement agreement.  Mr. Marcus testified at trial that he and Mr. Dunne intended that Mr. Dunne would retain beneficial ownership of his shares until the settlement date, but we did not find his testimony to be any more credible than Mr. Dunne's testimony that this was not his intention, particularly because of the animosity between the two witnesses.  Because the settlement agreement does not specify whether the "shareholder rights" include more than the retention of legal title to the stock, we will not require a higher standard of proof because of this statement.

To determine whether an agreement that does not itself transfer legal title nonetheless transfers substantially all of the accouterments of ownership, we look at all of the facts and circumstances surrounding the transfer, relying on objective evidence of the parties' intentions provided by their overt acts.

Ragghianti v. Commissioner, 71 T.C. at 349-350; Pacific Coast Music Jobbers, Inc. v. Commissioner, 55 T.C. at 874.  Some of the factors that we have considered in determining whether a person holds the accouterments of stock ownership for Federal income tax purposes are:

(1)  Whether the person has legal title or a contractual right to obtain legal title in the future, Ragghianti v. Commissioner, supra at 349;

(2)  whether the person has the right to receive consideration from the transferee of the stock, Hook v. Commissioner, 58 T.C. 267, 275 (1972); Willie v. Commissioner, T.C. Memo. 1991-182;

(3)  whether the person enjoys the economic benefits and burdens of being a shareholder, Pacific Coast Music Jobbers, Inc. v. Commissioner, supra at 875-876; Yelencsics v. Commissioner, 74 T.C. 1513, 1527 (1980);

(4)  whether the person has the power to control the company, Yelencsics v. Commissioner, supra at 1527; Cepeda v. Commissioner, T.C. Memo. 1994-62, affd. without published opinion 56 F.3d 1384 (5th Cir. 1995);

(5)  whether the person has the right to attend shareholder meetings, Yelencsics v. Commissioner, supra at 1528; Ragghianti v. Commissioner, supra at 350-351;

(6)  whether the person has the ability to vote the shares, Yelencsics v. Commissioner, supra at 1528; Pacific Coast Music Jobbers, Inc. v. Commissioner, supra at 874;

(7)  whether the stock certificates are in the person's possession or are being held in escrow for the benefit of that person, Pacific Coast Music Jobbers, Inc. v. Commissioner, supra at 874;

(8)  whether the corporation lists the person as a shareholder on its tax returns, Feraco v. Commissioner, T.C. Memo. 2000-312; Pahl v. Commissioner, T.C. Memo. 1996-176, affd. 150 F.3d 1124 (9th Cir. 1998);

(9)  whether the person lists himself as a shareholder on his individual tax return, Willie v. Commissioner, supra; Wilson v. Commissioner, T.C. Memo. 1975-92, affd. 560 F.2d 687 (5th Cir. 1977);

(10)  whether the person has been compensated for the amount of income taxes due by reason of the person's shareholder status, Hightower v. Commissioner, T.C. Memo. 2005-274;

(11)  whether the person has access to the corporate books, Haskel v. Commissioner, T.C. Memo. 1980-243; and

(12)  whether the person shows by his overt acts that he believes he is the owner of the stock, Pahl v. Commissioner, supra; Willie v. Commissioner, supra.

None of these factors alone is determinative, and their weight in each case depends on the surrounding facts and circumstances. One difficulty in this case is that it is not clear what rights an FRC shareholder was supposed to possess because FRC did not observe any corporate formalities. Furthermore, Mr. Marcus was a shareholder both before and after Mr. Dunne transferred beneficial ownership of his stock. Therefore, we will consider these factors in light of the rights Mr. Dunne had as a shareholder of FRC before the settlement agreement that he no longer had afterward, and where relevant, what rights Mr. Marcus did or did not gain as a result of the settlement agreement.

The fact that the settlement agreement gave Mr. Marcus the right to obtain legal title to the stock upon the satisfaction of certain conditions, which were likely to be satisfied at some point, weighs in favor of petitioners. See Pacific Coast Music Jobbers, Inc. v. Commissioner, supra at 874. While there was certainly much dispute over some of the terms of the settlement agreement, particularly the amount due to Mr. Dunne under the halon contract, it is undisputed that the settlement agreement contained Mr. Dunne's binding agreement to sell his stock for an amount that could be objectively determined and that Mr. Marcus had the intention and ability to comply with the terms of the sale once the disputes were settled. It appears that the signing

of a memorializing document was intended to be a mere formality. The settlement date was anticipated to be no more than 8 days after the signing of the agreement and there were no contract terms left to be decided on the settlement date, which suggests that the memorializing document would not contain any terms additional to or different from those contained in the settlement agreement. Furthermore, the arbitrator found the settlement agreement sufficiently definite to order the parties to comply with its terms in the arbitration award without requiring the parties to draw up a new memorializing document. Therefore, while under the terms of the settlement agreement Mr. Dunne had the right to retain legal title of his stock until the settlement date, the fact that the settlement agreement gave Mr. Marcus the right to legal title upon the satisfaction of certain conditions is a stronger indicium of beneficial ownership. See id. at 874.

Similarly, the fact that the settlement agreement gave Mr. Dunne a contractual right to obtain $175,000 and his share of the halon contract from Mr. Marcus as consideration for his shares weighs in favor of petitioners. We have recognized that a transfer of beneficial ownership can occur before the entire sale price has been paid. See Pacific Coast Music Jobbers, Inc. v. Commissioner, 55 T.C. 866 (1971).

The next factor we consider is whether Mr. Dunne continued to enjoy the economic benefits and burdens of being a shareholder

after the settlement agreement.  Benefits and burdens of stock ownership generally include sharing in the successes and failures of the corporation and receiving dividends.  Id. at 875-876; Yelencsics v. Commissioner, 74 T.C. at 1528.

Before the settlement agreement, Mr. Dunne shared in the successes and failures of FRC because those successes and failures affected the value of his stock.  After the settlement agreement, Mr. Dunne ceased to share in most of the business successes and failures of FRC because he agreed to sell his stock for the book value of FRC and his share of the halon contract. Mr. Dunne and Mr. Marcus agreed to set the book value of FRC at $175,000, and there is no indication that either Mr. Dunne or Mr. Marcus could renegotiate that amount if the value of FRC were to change substantially between May 8, 1997, and the settlement date.  Therefore, with the exception of FRC's performance on the halon contract, FRC's successes and failures had no economic effect on Mr. Dunne after May 8, 1997.

Mr. Dunne received monthly dividends from FRC from January through April of 1997, but he received no dividends after the settlement agreement.  Had Mr. Dunne retained beneficial ownership of FRC, we would expect these dividends to have continued through the end of 1997.  However, Mr. Marcus also ceased receiving dividends after April 1997.  Had the settlement agreement transferred beneficial ownership of Mr. Dunne's shares

to Mr. Marcus, we would expect FRC to have paid Mr. Marcus double the amount of monthly dividends that it had previously been paying.  Therefore, the nonpayment of dividends after April 1997 merely indicates that FRC was not sure what Mr. Dunne's status was after the settlement agreement.

The fact that Mr. Dunne was not compensated for any taxes relating to FRC's income after the settlement agreement favors petitioners.  FRC generally had a practice of compensating its shareholders for the income taxes they owed by virtue of their stock ownership.  Had FRC considered Mr. Dunne to be a shareholder, it would have paid the amount of the taxes either to or on behalf of Mr. Dunne.

Throughout Mr. Dunne's correspondence with FRC's bank and the bank's attorney in September and October 1997, Mr. Dunne repeatedly asserted that he was a director, officer, and coowner of FRC.  Mr. Dunne's request for proof that he did not have those titles after the bank denied him access to certain records suggests that he asserted those titles with the belief that they entitled them to this access.  Mr. Dunne also used those titles when he wrote to an FRC employee to request copies of FRC's Form 1120S and his Schedule K-1 for 1997.

Petitioners argue that Mr. Dunne asserted these titles because he retained legal ownership of FRC and he believed he had rights as a creditor of FRC.  Petitioners also rely on Mr.

Marcus's statement in his March 18, 1997, letter that it was his position that Mr. Dunne had in effect already sold his shares. While Mr. Dunne's actions indicate he believed he retained an interest in his FRC stock after signing the settlement agreement, we find that his belief was not based on a clear understanding of the law or the nature of his interest and is not controlling.

While petitioners argue that Mr. Dunne's lack of managerial control over FRC after the settlement agreement favors them, we disagree. It is not clear whether Mr. Dunne exercised any managerial control at all before 1997 or, if he did, whether he exercised control as a shareholder as opposed to an employee. See Pacific Coast Music Jobbers, Inc. v. Commissioner, supra at 877. Furthermore, any decrease in Mr. Dunne's control over FRC is consistent with Mr. Marcus's termination of Mr. Dunne's employment on January 25, 1997. The fact that Mr. Marcus was in complete control of FRC in 1997 is consistent with his status as FRC's president. Therefore, in the absence of evidence that shareholders of FRC had a right to manage, this factor is neutral.

The facts that Mr. Dunne did not participate in shareholder meetings or vote his shares are neutral because FRC never maintained these corporate formalities.

The fact that Mr. Dunne retained possession of the FRC stock certificates is also neutral. While a transfer of the stock

certificates would have helped petitioners' case, retaining possession of stock merely as security to ensure payment for the stock does not indicate retained beneficial ownership in this case. Hook v. Commissioner, 58 T.C. at 275; Pacific Coast Music Jobbers, Inc. v. Commissioner, supra at 875.

The facts that FRC listed Mr. Dunne as a shareholder on its return and petitioners did not list Mr. Dunne as a shareholder on their return are neutral when examined together because there is no reason to believe that either return is probative.

Because Mr. Dunne had access to some of FRC's records after the settlement agreement but then was denied access to others, these facts together are neutral. The most likely explanation is the one given by FRC's bank--that the bank was unsure whether Mr. Dunne continued to be a shareholder after the settlement agreement and it did not want to take unnecessary risks.

It is clear from the record that no one involved was sure whether Mr. Dunne was a shareholder of FRC after May 8, 1997, including Mr. Dunne himself. While we find that Mr. Dunne believed that he was a still a shareholder in 1997 when he thought that was his most advantageous position, his belief was not based on a clear understanding of the law and is not controlling. The halon contract was Mr. Dunne's only interest in FRC after the settlement agreement. In light of our analysis of the above factors, we find that Mr. Dunne's retention of an

interest in a single contract, over which he was exercising no managerial control after May 8, 1997, did not prevent him from transferring substantially all of the accouterments of ownership of FRC to Mr. Marcus in the settlement agreement.

Considering all of these factors, we hold, on the basis of our finding that Mr. Dunne ceased to be a shareholder of FRC on May 8, 1997, that petitioners must pay tax on their pro rata share of FRC's tax items.

III.  <u>Whether Mrs. Dunne Qualifies for Relief From Joint Liability Under Section 6015 for 1997</u>

Section 6013(d)(3) provides that taxpayers filing a joint return are jointly and severally liable for the taxes due. Section 6015 provides that notwithstanding section 6013(d)(3), under certain facts and circumstances a taxpayer may be relieved of joint and several liability.  Except as otherwise provided in section 6015, the requesting spouse bears the burden of proof. Rule 142(a); <u>Alt v. Commissioner</u>, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).

Mrs. Dunne argues that she is entitled to relief under section 6015(b) or (f).  Relief under section 6015(b)(1) is available if:

> (A) a joint return has been made for a taxable year;

> (B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;

(C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election * * *

Respondent concedes that Mrs. Dunne meets all of these conditions except for those found in section 6015(b)(1)(C) and (D).

Under section 6015(b)(1)(C), Mrs. Dunne is eligible for relief under this section only if she did not know or have reason to know at the time she signed the joint return that there was an understatement of tax on the return.

Petitioners' omission of income in 1997 arose because Mr. Dunne was a shareholder of FRC until May 8, 1997, but petitioners treated Mr. Dunne as ceasing to be a shareholder no later than December 31, 1996. Mrs. Dunne's Form 8857 makes it clear that she was aware that there were some issues regarding Mr. Dunne's connection with FRC, but she did not know any of the circumstances of the sale because she relied upon Mr. Dunne to handle the tax return, and Mr. Dunne relied upon the advice of an attorney that petitioners were not required to report the income on the Schedule K-1.

Generally, blind reliance upon the other spouse to handle tax issues is not sufficient to allow the requesting spouse to avoid liability under section 6015.  See Butler v. Commissioner, 114 T.C. 276, 283-284 (2000).  However, Mrs. Dunne asked Mr. Dunne whether the sale of his FRC stock would create any problems relating to their taxes, and Mr. Dunne assured her that he was handling the sale properly according to advice from his attorney. This is a unique case with complicated facts and legal issues, and we find that Mrs. Dunne satisfied her duty of inquiry.  See Juell v. Commissioner, T.C. Memo. 2007-219.  Therefore, we find that Mrs. Dunne did not have actual or constructive knowledge that there was an omission on petitioners' 1997 tax return and thus satisfies the section 6015(b)(1)(C) requirement.

However, Mrs. Dunne fails to satisfy the fourth condition. Under section 6015(b)(1)(D), relief is available under that section only if, taking into account all the facts and circumstances, it would be inequitable to hold the requesting spouse liable for the deficiency.  The two most often cited factors to be considered are:  (1) Whether there has been a significant benefit to the spouse claiming relief, and (2) whether the failure to report the correct tax liability on the joint return results from concealment, overreaching, or any other wrongdoing on the part of the other spouse.  Alt v. Commissioner, supra at 314.

Mrs. Dunne had full access to petitioners' joint checking and savings accounts, and she offered no evidence that Mr. Dunne deposited the dividends he received from FRC into a separate account that she could not access. Since it appears Mrs. Dunne financially benefited as much as did Mr. Dunne from ownership of FRC and from avoiding taxation on his share of income, the significant benefit factor does not favor Mrs. Dunne's position. See Richardson v. Commissioner, T.C. Memo. 2006-69, affd. 509 F.3d 736 (6th Cir. 2007). Furthermore, Mrs. Dunne has offered no evidence that Mr. Dunne concealed anything from her or committed any wrongdoing.

We may also consider factors used in determining "inequity" in the context of section 6015(f). Juell v. Commissioner, T.C. Memo. 2007-219. However, because we find without relying on the other factors that Mrs. Dunne has not shown that she is eligible for relief under section 6015(b), and because we find that taken together those factors weigh against relief for Mrs. Dunne, as discussed below, we need not consider them here also.

Section 6015(f) provides that the Secretary may relieve an individual of joint and several liability if relief is not available to the individual under section 6015(b) or (c) and it is inequitable to hold the individual liable for any deficiency taking into account all the facts and circumstances under procedures prescribed by the Secretary. These procedures are

found in Rev. Proc. 2003-61, 2003-2 C.B. 296.  We review respondent's denial of relief under section 6015(f) for abuse of discretion.  See Alt v. Commissioner, 119 T.C. at 315-316.

Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at 297, provides seven threshold conditions to determine relief.  Respondent concedes that Mrs. Dunne satisfies these conditions.  Mrs. Dunne mistakenly argues that she is entitled to relief by satisfying these threshold conditions alone.  On the contrary, after a taxpayer satisfies the threshold requirements, Rev. Proc. 2003-61, sec. 4.03, 2003-2 C.B. at 298, provides the Commissioner a nonexclusive list of factors that the Commissioner uses in determining whether the individual is entitled to relief on the basis of all the facts and circumstances in the case.  The relevant factors to be considered here are marital status, economic hardship, knowledge or reason to know, significant benefit, and compliance with the income tax laws.

The fact that petitioners have been married and living together at all relevant times is neutral.

The economic hardship factor also weighs against Mrs. Dunne.  Mrs. Dunne's only argument regarding this factor is that the amount of tax due is large.  However, Mrs. Dunne has not provided any evidence that (1) she will suffer economic hardship if we do not grant her relief, (2) she does not have sufficient assets to

pay this liability, or (3) the burden of paying this liability will fall on her instead of Mr. Dunne.

The knowledge factor weighs in favor of Mrs. Dunne. As we stated in our discussion of section 6015(b)(1)(C), given the circumstances of this case, Mrs. Dunne had no reason to know that Mr. Dunne held beneficial ownership of FRC through May 8, 1997, and she satisfied her duty of inquiry.

As discussed above, Mrs. Dunne presumably received some benefit from Mr. Dunne's status as a shareholder during 1997 because she shared bank accounts with Mr. Dunne, most likely had access to the dividends he received from FRC, and benefited as he did from avoiding tax on his share of its income. This factor weighs against Mrs. Dunne. See Richardson v. Commissioner, supra.

The compliance with the income tax law factor weighs slightly against Mrs. Dunne. Mrs. Dunne testified that the one thing she knows about the tax law is that income tax returns are due on April 15, yet as discussed below she failed to file her 1999 tax return on time without any reasonable cause.

Mrs. Dunne has not argued that there are any other factors that we should consider. We find on the basis of all the facts and circumstances Mrs. Dunne has failed to carry her burden and thus is not entitled to equitable relief under section 6015(f),

and we find respondent did not abuse his discretion in denying

Mrs. Dunne such relief.

IV.  Whether Petitioners May Claim $20,000 of Legal Expenses That They Incurred in 1999 as Trade or Business Expenses

In the notice of deficiency respondent disallowed a deduction for $20,000 that petitioners listed on their Schedule C as a business expense but added the $20,000 deduction to their Schedule A as a miscellaneous itemized expense.  If the $20,000 is deductible on petitioners' Schedule C, then it is not subject to the 2-percent floor generally applicable to miscellaneous itemized deductions under section 67.

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving entitlement to the deductions claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  In addition, taxpayers must maintain sufficient records to substantiate any deductions claimed.  Sec. 6001.

Petitioners argue that the notice of deficiency is arbitrary as to the tax items for 1999.  As discussed below, in certain cases we have found that the Commissioner's presumption of correctness does not attach when a determination is found to be a "naked" assessment and therefore arbitrary and excessive. However, this doctrine applies only to unreported income, and the usual presumption of correctness attaches when taxpayers assert that the notice of deficiency is incorrect as to disallowed

deductions.  Hutchinson v. Commissioner, T.C. Memo. 1980-551.
Furthermore, if taxpayers do not substantiate their claimed
deductions, the Commissioner is not arbitrary or unreasonable in
denying them.  Roberts v. Commissioner, 62 T.C. 834, 837 (1974);
Taylor v. Commissioner, T.C. Memo. 2006-67.

Petitioners offered no evidence regarding any expenditures
they made that would be eligible for a trade or business expense
deduction on their Schedule C.  Petitioners argue on brief that
these expenses were incurred for the collection of income, but
they offered no evidence to substantiate that the income was from
a trade or business they conducted.  Therefore, petitioners'
legal expenses are properly deductible only on their Schedule A.

V.  Whether Petitioners Had $15,000 of Unreported Income in 1999

In the notice of deficiency, respondent determined that
petitioners failed to report a $15,000 capital gain.  In general,
the Commissioner's determinations are presumed correct, and the
taxpayers bear the burden of proving that they are wrong.  Rule
142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The Court
generally will not look behind a notice of deficiency to examine
the evidence used or the propriety of the Commissioner's motives
or procedures in making his determination.  Greenberg's Express,
Inc. v. Commissioner, 62 T.C. 324, 327 (1974).  To overcome this
presumption of correctness, taxpayers may produce evidence that
the statutory notice is arbitrary or without foundation.

Helvering v. Taylor, 293 U.S. 507, 515 (1935); Cebollero v. Commissioner, 967 F.2d 986, 990 (4th Cir. 1992), affg. T.C. Memo. 1990-618.

On rare occasions, this Court has recognized an exception to these rules in cases involving unreported income where the Commissioner introduces no substantive evidence but relies solely on the presumption of correctness. Jackson v. Commissioner, 73 T.C. 394, 401 (1979). In such cases, if the taxpayers challenge the notice of deficiency on the ground that it is arbitrary, then the determination is treated as a "naked" assessment and the presumption of correctness does not attach. Id. However, this is a limited exception, and it does not apply when the Commissioner has provided a minimal evidentiary foundation. Petzoldt v. Commissioner, 92 T.C. 661, 687-688 (1989); Fankhanel v. Commissioner, T.C. Memo. 1998-403, affd. without published opinion 205 F.3d 1333 (4th Cir. 2000).

This exception to the presumption of correctness (the exception) has been widely accepted among the Courts of Appeals. See Blohm v. Commissioner, 994 F.2d 1542, 1549 (11th Cir. 1993), affg. T.C. Memo. 1991-636; Dodge v. Commissioner, 981 F.2d 350, 353 (8th Cir. 1992), affg. in part and revg. in part 96 T.C. 172 (1991); Portillo v. Commissioner, 932 F.2d 1128, 1133-1134 (5th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1990-68; United States v. Walton, 909 F.2d 915, 919 (6th Cir. 1990); Ruth

v. United States, 823 F.2d 1091, 1094 (7th Cir. 1987); Llorente
v. Commissioner, 649 F.2d 152, 156 (2d Cir. 1981), affg. in part
and revg. in part 74 T.C. 260 (1980); Weimerskirch v.
Commissioner, 596 F.2d 358, 362 (9th Cir. 1979), revg. 67 T.C.
672 (1977); Gerardo v. Commissioner, 552 F.2d 549, 554 (3d Cir.
1977), affg. in part and revg. in part T.C. Memo. 1975-341.

The Court of Appeals for the Fourth Circuit, to which this
case is appealable, has recognized the use of this exception by
other courts but has not had the occasion to expressly adopt or
reject it.  See Williams v. Commissioner, 999 F.2d 760, 763-764
(4th Cir. 1993), affg. T.C. Memo. 1992-153.  Because the Court of
Appeals for the Fourth Circuit has not expressly resolved the
issue of whether the Commissioner's failure to present a minimal
evidentiary foundation prevents the presumption of correctness
from attaching,[5] we apply the rule we stated in Jackson that has

[5] In Cebollero v. Commissioner, 967 F.2d 986, 990 (4th Cir.
1992), affg. T.C. Memo. 1990-618, the Court of Appeals for the
Fourth Circuit stated:

> in the first phase of a deficiency suit, the issue is
> the arbitrariness of the Commissioner's determination,
> and the taxpayer bears the burden of persuasion by a
> preponderance of the evidence.  That burden remains
> with the taxpayer, and never shifts to the government.
> If the taxpayer proves that the determination is
> arbitrary, the presumption of correctness vanishes.* * *

However, the Court of Appeals has not clarified whether the
taxpayer satisfies the initial burden of persuading the court
that the determination is arbitrary by alleging that the
Commissioner has not introduced any substantive evidence and is
relying solely on the presumption of correctness, or if the
(continued...)

been approved by the majority of the Courts of Appeals.  See

Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d

985 (10th Cir. 1971).

The first requirement for the exception to apply is that the

taxpayers challenge the notice of deficiency on grounds that it

is arbitrary.  In addition to raising the argument, this

generally requires that the taxpayers actually dispute that they

received the unreported income, either by filing a Form 1040 that

they signed under penalty of perjury for the year at issue or by

stating facts that tend to show that they did not in fact receive

the disputed income.  Andrews v. Commissioner, T.C. Memo. 1998-

316; White v. Commissioner, T.C. Memo. 1997-459.  But see Senter

v. Commissioner, T.C. Memo. 1995-311.

Petitioners have satisfied this requirement.  They allege in

their petition that the notice of deficiency was arbitrary as to

all determinations relating to 1999, and they filed a signed Form

1040 for 1999 that did not include a $15,000 capital gain.

The second requirement for the exception to apply is that

the Commissioner introduced no substantive evidence but relied

solely on the presumption of correctness.  Jackson v.

Commissioner, supra.  The presumption of correctness will apply

---

[5](...continued)
taxpayer must come forward with substantive evidence that the
determination is arbitrary to satisfy that initial burden.

if the Commissioner provides a minimal evidentiary foundation showing that there is a link between the taxpayers and either the taxable income or the income-producing activity.  Petzoldt v. Commissioner, supra; Kaufman v. Commissioner, T.C. Memo. 2003-262; Fankhanel v. Commissioner, supra; Prindle Intl. Mktg. v. Commissioner, T.C. Memo. 1998-164, affd. without published opinion sub nom. Fox v. Commissioner, 229 F.3d 1157 (9th Cir. 2000).

The only evidence either party submitted regarding the unreported capital gain issue was a copy of petitioners' 1999 Form 1040, the examination report, and the notice of deficiency. In these documents, the only explanation of respondent's determination that petitioners received unreported income in 1999 is the following statement made to petitioners in the notice of deficiency:  "It is determined that you realized a capital gain in the amount of $15,000.00 for tax year 1999.  Accordingly, taxable income is increased $15,000.00 for the tax year ending December 31, 1999."

The examination report contains an explanation section for capital gains and losses, but the entire discussion in that section relates to Mr. Dunne's issues with FRC, and there is no reference to a $15,000 capital gain in 1999 in either the facts or conclusion of that section.  The examination report did state in its conclusion that it will be necessary to compute the

gain/loss on the sale of the FRC stock, but respondent has not argued that the alleged unreported income relates to the sale of Mr. Dunne's FRC stock. Because respondent has not shown us any link between petitioners and either the $15,000 of unreported income or any income-producing activity that could have generated a $15,000 capital gain, respondent has not provided the minimal evidentiary foundation required for the presumption of correctness to attach on this issue. Therefore, respondent has not met the initial burden of showing that petitioners had unreported income in 1999 that is normally satisfied by the presumption of correctness, and we find for petitioners on this issue. See Foster v. Commissioner, 391 F.2d 727, 735 (4th Cir. 1968), affg. in part and revg. in part T.C. Memo. 1965-246.

## VI. Whether Petitioners are Liable for Additions to Tax Under Section 6651(a)(1) for 1997 and 1999

Section 6651(a)(1) imposes an addition to tax of up to 25 percent of the amount required to be shown as tax for failure to timely file a Federal income tax return unless the taxpayers show that the failure was due to reasonable cause and not due to willful neglect.

Section 7491(c) places the burden of production on the Commissioner to show that the imposition of an addition to tax is appropriate. To satisfy this burden, the Commissioner must present sufficient evidence that the particular addition to tax is appropriate. Higbee v. Commissioner, 116 T.C. 438, 446

(2001). If the Commissioner makes such a showing, the burden of proof is on the taxpayers to raise any issues that would negate the appropriateness of the penalty, such as reasonable cause. Id. Reasonable cause exists if the taxpayers "'exercised ordinary business care and prudence and [were] nevertheless unable to file the return within the prescribed time'." United States v. Boyle, 469 U.S. 241, 243 (1985) (quoting sec. 301.6651-1(c)(1), Proced. & Admin. Regs.).

The parties stipulated that petitioners did not timely file their 1997 or 1999 Federal income tax return. Furthermore, it is undisputed that petitioners had an obligation to file income tax returns for 1997 and 1999 under section 6012. Therefore, respondent has satisfied the initial burden of producing evidence to show that the addition to tax is appropriate.

Petitioners assert three reasons they had reasonable cause for failing to file their tax returns on time: (1) The ongoing litigation between Mr. Dunne, Mr. Marcus, and FRC prevented them from filing on time; (2) they did not receive Mr. Dunne's Schedule K-1 in time; and (3) they received legal advice to exclude FRC's income from their 1997 return. Because the 1999 return contained no items that were related to FRC, only the first reason may provide any reasonable cause for petitioners' failure to file their 1999 tax return on time.

As we discussed above, the ongoing litigation between Mr. Dunne, Mr. Marcus, and FRC was not determinative of the issue of when Mr. Dunne ceased to be a beneficial owner of FRC and the related income tax consequences. While we agree that Mr. Dunne's shareholder status was a confusing issue, we are not persuaded that this litigation prevented petitioners from filing their returns on time.

Contrary to petitioners' arguments, being involved in litigation does not excuse them from filing their Federal income tax returns on time. The cases they cite do not support their argument because petitioners would have been required to file income tax returns even if they had been awarded nothing under the arbitration and subsequent litigation, and petitioners were not suffering from incapacitating illnesses or otherwise disabled from filing a return during any relevant time. See Commissioner v. Walker, 326 F.2d 261 (9th Cir. 1964), affg. in part and revg. in part 37 T.C. 962 (1962); Adams v. Commissioner, T.C. Memo. 1990-478; Harris v. Commissioner, T.C. Memo. 1969-49.

Petitioners' argument that they did not have all of the necessary records to file their 1997 return because they did not receive Mr. Dunne's Schedule K-1 in time is also unpersuasive. Petitioners correctly point out that the Internal Revenue Manual (IRM) states that the inability to obtain records may constitute reasonable cause. 6 Administration, Internal Revenue Manual

(CCH), pt. 20.1.1.3.1.2.5, at 45,014 (Aug. 20, 1998).  The IRM states that whether the inability to obtain necessary records constitutes reasonable cause depends on the facts and circumstances in each case, considering factors including:  (1) Why the records were needed to comply; (2) what steps the taxpayers took to secure the records; (3) when the taxpayers became aware that they did not have the necessary records; (4) if other means were explored to secure the needed information; (5) why the taxpayers did not estimate the information; (6) if the taxpayers contacted the IRS  for instructions on what to do about missing information; and (7) if the taxpayers complied once the missing information was received.

The IRM does not help petitioners.  They provided no explanation as to:  (1) Why they thought that they needed the Schedule K-1 to file their return if they were taking the position that Mr. Dunne was not a shareholder in 1997; (2) why they did not request a Schedule K-1 until April 15, 1998; (3) whether they considered any other ways of obtaining the information on the Schedule K-1; (4) why they did not estimate the information, especially since Mr. Dunne knew about how much income FRC earned in 1997 and, regardless of that amount, petitioners took the position that Mr. Dunne was not an FRC shareholder in 1997; (5) whether they contacted the IRS for instructions and, if so, whether they followed those

instructions; or (6) when they actually received the Schedule K-1 and how long it took them to file their return after receiving it.

It is well settled that taxpayers must file timely income tax returns on the basis of the best information available to them at the time, and they may file amended returns if necessary. Estate of Vriniotis v. Commissioner, 79 T.C. 298, 311 (1982); Elec. & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1342-1344 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974); Ruddel v. Commissioner, T.C. Memo. 1996-125. Petitioners knew approximately what FRC's income was for 1997, and there is no reason they could not have used that information to timely file their 1997 tax return and then file an amended return once they received the Schedule K-1. Furthermore, petitioners have not provided us any evidence of when they received the Schedule K-1. Thus, we are not convinced that they did not have it in time to file their 1997 return. Even if this was the case, the fact that petitioners filed their 1997 return on September 1, 1999, over a year after it was due after the extension, suggests that they did not exercise ordinary business care and prudence to file their return on time.

Petitioners' argument that they received legal advice to exclude the amounts reported on the Schedule K-1 is without merit. Whether or not petitioners should have excluded the

Schedule K-1 is irrelevant to the issue of whether they were required to file their returns on time.  Furthermore, even if the advice had provided a reasonable cause for not filing on time, the memorandum containing the written advice was dated October 9, 1998, almost two months after petitioners were required to file their 1997 return.  Thus, it is unlikely that petitioners actually relied upon any legal advice when making the decision not to file their 1997 tax return on time.  See Estate of Hinz v. Commissioner, T.C. Memo. 2000-6.

Accordingly, we find that petitioners did not have reasonable cause for failure to file their 1997 and 1999 income tax returns on time and therefore sustain respondent's determination that petitioners are liable for the additions to tax under section 6651(a)(1).

To reflect the foregoing and concessions of the parties,

Decision will be entered

under Rule 155.