T.C. Memo. 2005-274



UNITED STATES TAX COURT



GLENN HIGHTOWER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket No. 8679-04.                    Filed November 28, 2005.



        Petitioner (P) and Daniel O'Dowd each owned 50
percent of the stock of an S corporation (GH).  O'Dowd
exercised his rights under the shareholders' agreement
to buy P's shares.  P opposed the buyout in arbitration
proceedings to which P and O'Dowd had agreed to be
bound.  In 2000, the arbitrator ruled against P, and P
received $41,585,388 in exchange for his GH stock.  P
deposited the payment in an interest-bearing account.
From 2000 to 2003, P unsuccessfully opposed the buyout
in California State courts.

        P received no dividends from GH in 2000, but he
retained the right to receive dividends and vote his
shares of GH stock.

        <u>Held</u>: P is taxable on the payment he received for
his GH stock and related interest in the years paid.

        <u>Held</u>, <u>further</u>, P is taxable on a distributive share
of GH's income in 2000.

Glenn Hightower, pro se.

Catherine Campbell, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge: Respondent determined deficiencies in petitioner's Federal individual income tax of $7,535,620 for 2000 and $389,455 for 2001. After respondent's concession,[1] the issues for decision are:

1. Whether $41,585,388 petitioner received in 2000 in a corporate stock buyout of his shares in an S corporation and interest credited in 2000 and 2001 to the account in which he deposited the payment is included in petitioner's income for those years. We hold that it is.

2. Whether petitioner is required to include in income for taxable year 2000 a distributive share of the S corporation's 2000 income. We hold that he is.

Unless otherwise indicated, section references are to the Internal Revenue Code as amended in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

---

[1] Respondent concedes that the amount of petitioner's unreported interest income for 2001 is $44,021 less than respondent determined in the notice of deficiency.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioner resided in Issaquah, Washington, when the petition in this case was filed.

A.  Green Hills Software, Inc.

1.  Formation

Daniel O'Dowd (O'Dowd), petitioner, and a third individual organized Green Hills Software, Inc. (Green Hills), as a California corporation in 1986.  Green Hills became a Delaware corporation in 1986.  Green Hills was an S corporation for Federal income tax purposes at all relevant times.

Petitioner and O'Dowd bought the stock of the third individual in 1992.  They each owned 30,000,300 shares thereafter.  Petitioner was chairman of the board and secretary, and O'Dowd was president and treasurer.  Petitioner and O'Dowd were Green Hills' only directors.

2.  Buyout Provisions in the Shareholders' Agreement

Petitioner and O'Dowd entered into a shareholders' agreement in 1992 which provided that any dispute between them would be resolved through binding arbitration.  It also provided that either of them could compel a buyout of the stock held by the other at a price determined by a formula.

3.  Events Leading to O'Dowd's Buyout of Petitioner's Stock

Relations between O'Dowd and petitioner deteriorated in 1997 and 1998. Petitioner went to Green Hills' headquarters on March 15, 1998. O'Dowd demanded that petitioner leave and threatened to call the police if petitioner refused. On March 25, 1998, O'Dowd notified petitioner that his access to the company was denied, that the locks had been changed, and that his employment and access to the computer system had been terminated.

Petitioner was the record owner of his shares until October 13, 2000. He retained the right to vote his stock and to receive dividends until that date. He received dividends in 1998 and 1999, no dividends in 2000, and a salary of $13,822 in 1998, $51,381 in 1999, and $16,666 in 2000.

4.  O'Dowd's Buyout of Petitioner

In a letter dated June 26, 1998, O'Dowd properly triggered the buy/sell provision of the shareholders' agreement by offering either to sell his shares to petitioner for $47 million or to buy petitioner's shares for $47 million. The letter also stated that O'Dowd had deposited with Green Hills a certified check for $47 million payable to petitioner in conformity with the shareholders' agreement. Petitioner did not want to sell his stock. Instead, he wanted to exercise his right under the shareholder's agreement to buy O'Dowd's stock for the amount O'Dowd had offered for petitioner's stock ($47 million).

However, petitioner could not obtain financing.  Thus, O'Dowd compelled a buyout of petitioner's stock.

B.  Arbitration

1.  Proposed Interim Award

On August 24, 1998, pursuant to the arbitration clause of the shareholders' agreement, petitioner demanded arbitration regarding O'Dowd's buyout.  On December 1, 1999, the arbitrator issued a proposed interim award (the December 1999 award) finding that O'Dowd had not acted improperly in his attempt to buy petitioner's shares.  The December 1999 award stated that the arbitrator would reassess the award after considering motions for reconsideration and entry of partial final award.

2.  Partial Final Award

The arbitrator issued a partial final award on March 8, 2000.  The arbitrator found that O'Dowd's actions were consistent with the buyout provision of the shareholders' agreement.  The award permitted O'Dowd to treat the purchase of petitioner's stock as having occurred on September 24, 1998, 90 days after O'Dowd invoked the buyout provision of the shareholders' agreement.  The arbitrator made the following findings:  (a) But for petitioner's failure to tender his shares to O'Dowd within 90 days of O'Dowd's deposit of $47 million with Green Hills, his legal or beneficial interest in Green Hills would have terminated on September 24, 1998; (b) O'Dowd has the right but not the

obligation to pay or cause Green Hills to pay petitioner for the shares ($47 million) by September 24, 1998; (c) the purchase price shall be reduced by dividends and salary (net after payment of taxes) paid to petitioner for the period after September 24, 1998; and (d) until O'Dowd completes the purchase of petitioner's stock, petitioner shall be paid all dividends in accordance with the shareholders' agreement, which payments shall offset the purchase price for the shares.

3.   Corrected Partial Final Award

The arbitrator issued a corrected partial final award on April 25, 2000, which provides in pertinent part:

> The purchase price shall be offset and reduced by all dividends paid to * * * [petitioner] based on Green Hills' earnings for the Third Quarter of 1998 and thereafter until the date of purchase of * * * [petitioner's] share; said offset shall be reduced by the amount of ordinary taxable income of Green Hills (excluding long term capital gains) attributable to * * * [petitioner] for the period September 24, 1998 until the purchase date multiplied by a fraction the numerator of which is .1367 and the denominator of which is .7070.

Petitioner filed a petition in the California Superior Court for the County of Los Angeles (the Superior Court) and a petition for writ of mandate in the Court of Appeal of the State of California for the Second District (the Court of Appeal) in an effort to have the partial final award vacated.  Both petitions were denied.

C.   Payment to Petitioner for His Green Hills Stock

    1.   Adjusted Purchase Price

Green Hills hired an accountant to compute the adjusted purchase price pursuant to the corrected partial final award.[2] The accountant estimated the adjusted total purchase price for petitioner's shares to be $42,862,230.95 as of October 15, 2000.

    2.   Delivery and Deposit of Payment

On October 13, 2000, O'Dowd delivered checks to petitioner in the amounts of $32,585,388 and $9 million as payment for petitioner's shares in Green Hills.  Both checks were dated October 13, 2000.  The face and endorsement areas of each check indicated that the check was not valid if presented for payment after October 23, 2000.  O'Dowd drafted a receipt for the checks that read in pertinent part: "Receipt of * * * [checks] aggregating $41,585,388 as payment for all of the shares of Glenn Hightower in Green Hills Software, Inc. is hereby acknowledged."  Petitioner crossed out the phrase "as payment for all of the shares of Glenn Hightower in Green Hills Software, Inc.", signed the receipt, and deposited the checks in an interest-bearing bank

_____

[2]  The accountant computed the adjustment by, among other things, subtracting $3,163,484 of dividends paid in 1998 and 1999 and adding .1367/.7070 of $6,251,054 total ordinary taxable income for 1998 and 1999, and .1367/.7070 of $3,494,666 estimated ordinary taxable income for 2000 through Oct. 15, 2000.  The payment to petitioner was increased by approximately the amount of petitioner's Federal income tax on a distributive share of income from Green Hills.  See par. B. in Opinion, below.

account that petitioner had opened in his own name solely to hold the funds.

In a letter to O'Dowd dated October 13, 2000, petitioner's attorney stated: (a) Petitioner would tender his shares of Green Hills to O'Dowd, as required by the arbitrator's award under protest, and without waiver of any rights or remedies; (b) the shares were to be held in trust; and (c) petitioner was not entitled to the checks. Petitioner delivered his stock to O'Dowd on October 13, 2000. Petitioner did not endorse the shares.

Interest was credited to petitioner's account in the amounts of $469,593.63 in 2000 and $1,513,788.28 in 2001. There were no transactions on the account in 2000 or 2001 other than the crediting of interest and withholding of Federal income tax.

In a letter to petitioner's attorney dated November 21, 2000, O'Dowd's attorney stated that the account into which petitioner had deposited the $41,585,388 was not a trust account. O'Dowd's attorney offered to hold the funds for petitioner in the attorney's trust account. Petitioner did not respond to the offer.

D.   Later Events Relating to the Arbitration

In February 2001, the Court of Appeal denied petitioner's request to stay the arbitration proceedings. Petitioner filed a motion for rehearing with the Court of Appeal, and the motion was denied. Petitioner filed a petition for review in the Supreme

Court of California on March 28, 2001. The petition was denied
on May 16, 2001.

The arbitrator issued a final award in the arbitration
proceedings on August 29, 2001. He found that: (1) O'Dowd's
purchase of petitioner's Green Hills stock for $41,585,388
complied with the partial final award and was effective on
October 13, 2000; (2) the payment belongs to petitioner without
restriction; (3) petitioner's acceptance of the payment on
October 13, 2000, terminated his interest in Green Hills; (4)
petitioner is entitled to an additional $52,783;[3] (5) O'Dowd is
entitled to $604,105.30 for attorney's fees, costs, and expenses;
and (6) the net amount petitioner owes O'Dowd is $551,322.30.

On December 11, 2001, petitioner petitioned the Superior
Court to vacate the arbitration award. On December 21, 2001, the
Superior Court entered a judgment confirming and substantially
repeating the findings in the arbitrator's final award.

Petitioner appealed the Superior Court's decision. On July
31, 2003, the Court of Appeal filed its opinion rejecting
petitioner's appeal and affirming the decision of the Superior
Court. Petitioner filed a motion for rehearing on August 15,
2003. Petitioner's motion was denied on August 20, 2003.
Petitioner filed a petition for review in the Supreme Court of

---

[3] This adjustment was made to correct an error in the
calculation of the offsets to the purchase price.

California on September 9, 2003. That petition was denied on October 22, 2003. No other actions concerning the validity of the buyout were pending on the date of trial.

E.  Petitioner's Basis in Green Hills Stock, Distributive Share of Income From Green Hills, and Income Tax Returns for 2000 and 2001

Petitioner's basis in Green Hills stock was $8,315,584 on December 31, 1999. Green Hills reported $4,275,909 as petitioner's distributive share of income through October 13, 2000.[4]

Petitioner filed Federal income tax returns for 2000 and 2001 on the cash receipts and disbursements method of accounting. On his 2000 return, petitioner did not include a distributive share of income from Green Hills. Petitioner did not include in income on his 2000 and 2001 returns the $41,585,388 payment or any of the interest credited to the account in which he had deposited that payment.

---

[4] In the notice of deficiency, respondent determined that petitioner's basis in Green Hills was $12,523,085 for purposes of determining petitioner's gain on the sale of Green Hills stock on Oct. 13, 2000. Adding a $4,275,909 distributive share of income to petitioner's basis in Green Hills of $8,315,584 on Dec. 31, 1999, does not produce the basis determined by respondent. The record does not show whether respondent determined petitioner's basis correctly. Thus, if we decide that the $41,585,388 is includable in petitioner's income in the year received, the parties shall compute the amount of gain under Rule 155.

OPINION

A.   Whether the Payments at Issue Are Taxable to Petitioner in the Years Received

   1.   Contentions of the Parties

The parties dispute whether the payment to petitioner for the stock buyout and related interest are taxable to petitioner in 2000 and 2001.  Petitioner contends that those amounts are not taxable in those years because of the claim of right doctrine.  Respondent disagrees.[5]  We agree with respondent.

Income includes all economic gains not specifically exempted from taxation.  See sec. 61; Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429 (1955).  Income is generally taxable in the year in which the taxpayer receives it unless, under the method of accounting used by the taxpayer, the amount is properly taxable in another year.  Sec. 451(a).  For taxpayers using the cash method of accounting, income is taxable in the year actually or constructively received.  Sec. 1.451-1(a), Income Tax Regs.

Under the claim of right doctrine, a payment is includable in income in the year in which a taxpayer receives it under a claim of right (even if that claim is disputed by another party)

---

[5]   Income generally includes proceeds of a stock sale (less a taxpayer's basis) and interest on money received.  Secs. 61(a)(3), (4), 1001.  Respondent contends that petitioner received income in the amount of the gross proceeds less his basis in the stock, plus all of the interest credited to the account in which he had deposited that payment.

and without restriction as to its disposition.[6]  Healy v. Commissioner, 345 U.S. 278, 281-282 (1953); United States v. Lewis, 340 U.S. 590, 591 (1951); N. Am. Oil Consol. v. Burnet, 286 U.S. 417 (1932).[7]  The claim of right doctrine results in part from the requirement to account for income annually.  Healy v. Commissioner, supra at 281; United States v. Lewis, supra at 592; Burnet v. Sanford & Brooks Co., 282 U.S. 359, 363 (1931).

The burden of proving a factual issue relating to liability for tax shifts to the Commissioner under certain circumstances. Sec. 7491(a).  Petitioner does not contend that section 7491 applies.  Thus, petitioner bears the burden of proof.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

  2.  Whether the Payments at Issue Are Taxable in the Years Received

We next consider petitioner's argument that, under the claim of right doctrine, petitioner is excused from the general rule that income is taxable in the year in which the taxpayer receives

---

[6]  See generally Lister, "The Use and Abuse of Pragmatism: The Judicial Doctrine of Claim of Right", 21 Tax L. Rev. 263 (1966).

[7]  In N. Am. Oil Consol. v. Burnet, 286 U.S. 417, 424 (1932), the Supreme Court articulated the claim of right doctrine as follows:

> If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent.

it.  Petitioner contends that the general rule does not apply because the conditions for application of the claim of right doctrine (i.e., receipt of income under a claim of right and without restriction as to its disposition) have not been met.

### a.    Whether Petitioner Received Income in 2000 and 2001

Petitioner argues that he did not receive a payment from O'Dowd in 2000 because he held O'Dowd's payment in trust in a segregated account.  We disagree.  Petitioner received the funds and deposited them in an account he had opened in his name.  There is no evidence that petitioner held the funds in trust.

Petitioner argues that the funds were not income until the litigation was final and that the sale was incomplete because he tendered his shares without endorsing the certificates.  We disagree.  The arbitrator found in the partial final award in 2000, which the California courts later affirmed, that petitioner's stock was purchased in 2000.  We conclude that petitioner received payment for his stock in 2000 when he received the checks and that he received interest thereon in 2000 and 2001 when it was credited to the bank account into which he had deposited the payment.  This result is not changed by the fact that petitioner did not endorse the stock certificates.

b.    Whether Petitioner's Disposition of the Funds Was
      Restricted

Petitioner deposited the stock payment in an interest-bearing account which he established solely to hold those funds. He did not withdraw or otherwise use the payment or interest credited to that account during the years at issue.  However, absence of use of funds by a taxpayer does not prevent inclusion of the funds in income under the claim of right doctrine.  See Commissioner v. Alamitos Land Co., 112 F.2d 648, 650-651 (9th Cir. 1940), revg. 40 B.T.A. 353 (1939) (funds received in litigation were income in year paid even though the funds were shown on the taxpayer's books as a reserve to be repaid to an adverse litigant if successful on appeal).

Petitioner argues that his use of the funds was restricted by State law in that if he accepted the funds, Green Hills would have negative retained earnings which is prohibited by California and Delaware law.[8]  Even if payment of the funds to petitioner violated State law, a subsequent determination to that effect would not absolve petitioner from his tax liability in the year of the receipt.  See Healy v. Commissioner, supra; Wentworth v. Commissioner, 510 F.2d 883, 886 (6th Cir. 1975), affg. T.C. Memo. 1973-199; Hamlett v. Commissioner, T.C. Memo. 2004-78.

---

[8]    The parties do not contend that the result on this issue differs depending whether California or Delaware law applies.

c.   Whether Petitioner's Opposition to the Buyout
     Precludes Taxation of the Payments in the Years
     the Payments Were Received

Petitioner contends that under the claim of right doctrine the payments are not taxable to him in the years he received them because he opposed the stock buyout, he established a separate, interest-bearing account to hold the payments, and he did not use the funds during the years in issue.

Contrary to petitioner's contention, a payment properly made to a taxpayer is includable in income in the year paid if, as here, the taxpayer (a) receives and deposits the payment in an unrestricted account, (b) seeks to invalidate the transaction or circumstance which caused the payment to be made, and (c) has no fixed obligation to pay the amount to another party. Hope v. Commissioner, 471 F.2d 738, 741-742 (3d Cir. 1973) (sale of stock taxable in year of sale despite taxpayers' efforts to rescind stock sale in that year), affg. 55 T.C. 1020 (1971). In addition, a taxpayer is taxable in the year the taxpayer receives wages where the taxpayer tried to return the wages to her employer and the employer refused to accept repayment. Miller v. Commissioner, T.C. Memo. 1963-341, affd. without published opinion 15 AFTR 2d 321, 65 USTC par. 9,288 (9th Cir. 1965). In both of these cases, like the instant case, the taxpayer's renunciation was not accepted by the other party.

A payment may not be taxable in the year it is received if, in that year, the recipient-taxpayer recognizes an unconditional obligation to pay it to another party. See Bates Motor Transp. Lines, Inc. v. Commissioner, 200 F.2d 20, 24 (7th Cir. 1952), affg. 17 T.C. 151 (1951). As another example, amounts paid by a customer to a taxpayer were not income in the year received to the extent that the taxpayer acknowledged an obligation to pay the amounts to the taxpayer's supplier, even though the agreement was unenforceable. Lashells' Estate v. Commissioner, 208 F.2d 430, 435 (6th Cir. 1953), affg. in part, revg. in part and remanding a Memorandum Opinion of this Court; Shaara v. Commissioner, T.C. Memo. 1980-247.

Petitioner asserts that Hope v. Commissioner, supra, is distinguishable because in Hope the taxpayers instituted the stock sale and then tried to rescind it, while petitioner opposed the transaction from the beginning. We disagree that this factual distinction is significant. What we believe is controlling is that, like the taxpayers in Hope v. Commissioner, supra, and Miller v. Commissioner, supra, petitioner's renunciation of the right to the amount received was not coupled with an unconditional agreement or understanding with another party to return the amount received.

Petitioner relies on United States v. Merrill, 211 F.2d 297, 302-303 (9th Cir. 1954).[9]  In that case, the Court of Appeals for the Ninth Circuit held that a payment mistakenly made to a taxpayer who had no right to receive it is not taxable in the year of receipt if, in that year, the taxpayer renounces any claim to the funds, recognizes an obligation to repay, and makes provision for repayment in the form of a journal entry on the taxpayer's books.  Id. at 303-304.  Petitioner's situation differs from that of the taxpayer in Merrill because the payment of funds to petitioner was not a mistake, petitioner had the right to receive the funds, and there was no existing agreement with O'Dowd to return the payment.  In Bates Motor Transp. Lines, Lashells' Estate, and Merrill, each recipient of funds had an agreement with another party during the year of receipt to return the funds.

Petitioner contends that he involuntarily received the funds, that he unconditionally renounced his right to them, and that he thought that not cashing the checks may have caused him to lose the $41,585,388 or be subject to the cost of financing an additional purchase.  We disagree.  He voluntarily cashed the checks he received.  Creating a separate account to hold the

---

[9]  We relied on the holding in United States v. Merrill, 211 F.2d 297, 302-303 (9th Cir. 1954), in Bishop v. Commissioner, 25 T.C. 969, 974 (1956).  See also Gaddy v. Commissioner, 38 T.C. 943, 947-948 (1962), affd. in part and remanded in part on another issue 344 F.2d 460 (5th Cir. 1965).

funds does not show that petitioner unconditionally renounced his right to the funds.  Petitioner's renunciation was not pursuant to an "existing" or "fixed" agreement to return the funds.  On the contrary, petitioner intended to return the funds only if he succeeded in rescinding O'Dowd's buyout.[10]

### d. Conclusion

As stated above, income is generally taxable in the year in which the taxpayer receives it unless, under the method of accounting used by the taxpayer, the amount is properly taxable in another year.  Sec. 451(a).  Under the claim of right doctrine, this principle applies to income received by a taxpayer and over which the taxpayer has unrestricted use, even if the taxpayer's claim to the income is disputed by another party.  Petitioner accepted and kept the payment and related interest

---

[10]  Neither party cited Sohio Corp. v. Commissioner, 163 F.2d 590 (D.C. Cir. 1947), revg. 7 T.C. 435 (1946).  In that case, the Court of Appeals for the District of Columbia held that a taxpayer which (1) was required by Illinois law to receive income, (2) would have been subject to monetary penalties if it had not received the income, (3) protested the payment, and (4) immediately commenced and later prevailed in a court challenge to the constitutionality of the statute under which the payment was received did not have income in the year of receipt.  Id. at 593.

Petitioner's situation is distinguishable from that of the taxpayer in Sohio Corp. v. Commissioner, supra.  The taxpayer in Sohio Corp. did not receive and retain the payment voluntarily, but rather did so under the compulsion of State law and the threat of heavy penalties.  Id. at 593.  In contrast, petitioner agreed to be bound by the shareholders' agreement that contained the buyout provision and arbitration procedures.  The receipt, retention, and deposit of funds in petitioner's bank account were voluntary.

until he learned if his appeal would be successful. Under these circumstances, we hold that the payment and related interest are taxable in the years petitioner received them.

B. Whether Petitioner Must Include in His Income a Distributive Share of Green Hills' Income

The next issue for decision is whether petitioner must include in his income for 2000 a distributive share of Green Hills' income from January 1 to October 13, 2000.

1. Taxation of S Corporation Income

Generally, income, losses, deductions, and credits of an S corporation are passed through pro rata to shareholders on their individual income tax returns based on days of ownership whether or not the income is distributed. Secs. 1363(a), 1366(a), 1366(c), 1377(a)(1). Ordinarily, the person who would be taxable on a dividend if the corporation were a C corporation is considered to be the shareholder of an S corporation. Sec. 1.1361-1, Income Tax Regs.[11]

---

[11] Sec. 1.1361-1, Income Tax Regs., provides in part:

(e) Number of Shareholders. (1) * * * Ordinarily, the person who would have to include in gross income dividends distributed with respect to the stock of the corporation (if the corporation were a C corporation) is considered to be the shareholder of the corporation. * * * The person for whom stock of a corporation is held by a nominee, guardian, custodian, or an agent is considered to be the shareholder of the corporation for purposes of this paragraph (e) and paragraphs (f) and (g) of this section. * * *

2. <u>Petitioner's Contentions</u>

When the record owner of S corporation stock holds that stock for the benefit of another, such as a nominee, agent, or passthrough entity, income, losses, deductions, and credits of the corporation are passed through not to the record owner but to the beneficial owner of the stock. Sec. 1.1361-1(e), Income Tax Regs. A taxpayer is the beneficial owner of property if the taxpayer controls the property or has the economic benefit of ownership of the property. <u>Anderson v. Commissioner</u>, 164 F.2d 870 (7th Cir. 1947), affg. 5 T.C. 443 (1945).

Petitioner contends, in effect, that he was not the beneficial owner of his Green Hills stock in 2000, and no Green Hills income passes through to him, because beginning before 2000 O'Dowd improperly excluded him from the benefits of ownership of that stock. We disagree.

First, petitioner has cited no authority for the proposition that a record owner of S corporation stock is not subject to pass through of S corporation income because the record owner has a diminished role in the corporation as a result of having a poor relationship with another shareholder. Courts have frequently considered whether an individual is a beneficial owner of the stock of an S corporation in deciding whether that person will be treated as a shareholder of that corporation for tax purposes. See, e.g., <u>Pahl v. Commissioner</u>, 150 F.3d 1124 (9th Cir. 1998),

affg. T.C. Memo. 1996-176; <u>Cabintaxi Corp. v. Commissioner</u>, 63
F.3d 614 (7th Cir. 1995), affg. in part and revg. in part T.C.
Memo. 1994-316; <u>Wilson v. Commissioner</u>, 560 F.2d 687 (5th Cir.
1977), affg. T.C. Memo. 1975-92; <u>Anderson v. Commissioner</u>, <u>supra</u>;
<u>Yelencsics v. Commissioner</u>, 74 T.C. 1513 (1980); <u>Hook v.
Commissioner</u>, 58 T.C. 267 (1972); <u>Beirne v. Commissioner</u>, 52 T.C.
210 (1969); <u>Hoffman v. Commissioner</u>, 47 T.C. 218 (1966), affd.
per curiam 391 F.2d 930 (5th Cir. 1968).  All of these situations
involve an arrangement between parties who had some agreement or
understanding regarding their relationship with each other.[12]
However, in none of these cases was the profit of an S
corporation not passed through to one of its shareholders because
of a poor relationship between the shareholders.  We conclude
that the beneficial ownership test does not relieve petitioner
from passthrough of Green Hills profits.

Second, respondent alleges, and petitioner does not deny,
that the payment to petitioner for his Green Hills stock was
increased by approximately the amount of petitioner's Federal
income tax on a 50-percent distributive share of income from

---

[12] See generally Bravenec, Federal Taxation of S
Corporations and Shareholders, pp. 7-12 to 7-13 (2d ed. 1988),
showing examples of when beneficial ownership test is applied:
creditor vs. debtor; nominal shareholder vs. creditor; donor vs.
donee; estate vs. heir; entity vs. shareholder; buyer vs. seller;
subscriber, redeeming shareholder, or director vs. corporation.

Green Hills.[13] Petitioner received through the arbitrator's award a payment compensating him for his increased Federal income tax liability. Petitioner would receive a windfall if he were not required to pay the tax which was already paid to him as part of the sale of his Green Hills stock. Petitioner makes no persuasive argument that removes this situation from the general definition of a shareholder under section 1.1361-1, Income Tax Regs.

---

[13] The purchase price was increased by the distributive share of taxable income multiplied by a fraction the numerator of which is .1367 and the denominator of which is .7070. The .1367/.7070 fraction is about 0.1933. Thus, the purchase price was increased by about 19.33 percent of the total distributive share of income. The top marginal rate of tax on ordinary income for unmarried individuals for 1998, 1999, and 2000, was 39.6 percent. Sec. 1(c). However, the top marginal rate on capital gains income for 1998 was 20 percent, see sec. 1(h)(1)(C), or 18 percent for qualified 5-year gain, see sec. 1(h)(2)(B). Petitioner incurred tax on his distributive share of income at the ordinary income rates, and increased his basis in his Green Hills stock by the same amount. If he had sold his stock in 1998, he would not have incurred tax on his distributive share of income in 1998, 1999, and 2000, but his capital gain would have been higher by the amount of this distributive share of income. Even though petitioner's taxable income would be the same, he incurred more tax than he would have because the capital gains rates are lower than the ordinary income rates. Respondent asserts (and petitioner does not deny) that the arbitrator used a formula to increase the purchase price to compensate petitioner for the difference between Federal income tax imposed on a distributive share of income (for which he would not have been held liable if he had sold the stock on Sept. 24, 1998, but which the parties recognized petitioner was liable or for which he was going to be liable) and that imposed on the change in his capital gain (which would have been higher had the stock been sold in 1998 and petitioner not incurred an additional distributive share of income).

3.  <u>Conclusion</u>

We conclude that petitioner must include in income a 50-percent share of the income Green Hills earned in 2000 until October 13, 2000.

To reflect the foregoing and respondent's concession,

<u>Decision will be</u>

<u>entered under Rule 155</u>.