T.C. Memo. 2017-222

UNITED STATES TAX COURT

JAY ENIS AND SUE ENIS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14391-13.　　　　　　　　Filed November 15, 2017.

<u>Dennis G. Kainen</u> and <u>Jerome M. Hesch</u>, for petitioners.

<u>Andrew M. Tiktin</u> and <u>Timothy A. Sloane</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, <u>Judge</u>:  In separate notices of deficiency both dated March 14, 2013, respondent determined the following deficiencies and additions to tax:[1]

_____

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the years in issue.  Rule

(continued...)

|  | Year | Deficiency | Addition to tax sec. 6651(a)(1) |
|---|---|---|---|
| [*2] | 2007 | $184,488 | $45,056 |
|  | 2010 | 358,559 | 88,461 |

After concessions,[2] the issues for decision are: (1) whether petitioner Sue Enis was a shareholder of Nationwide Laboratory Services, Inc. (NLS)--an S corporation--during the years in issue and is therefore liable for tax on her pro rata share of the S corporation's income for the 2007 and 2010 taxable years; (2) whether petitioners are entitled to theft loss deductions under section 165(e) for the 2007 and 2010 taxable years; (3) whether petitioners are entitled to deduct a $140,809 loss from SE Investments, LLC (SEI) for the 2010 taxable year; (4) whether petitioners are entitled to net operating loss (NOL) carryforward and carryback deductions for the 2007 and 2010 taxable years; and (5) whether

---

[1](...continued) references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[2] Respondent conceded that petitioners sustained a net operating loss of $69,965 for the 2011 taxable year and that this net operating loss can be carried back to 2010 under sec. 172(b)(1)(A). Additionally, respondent conceded that petitioners would be entitled to deduct a distributive share of certain of NLS' losses if we find, as we do below, that Mrs. Enis was a shareholder of NLS during the years in issue.

[*3] petitioners are liable for additions to tax under section 6651(a)(1) for the 2007 and 2010 taxable years for their failure to file timely returns.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners resided in Florida at the time their petition was timely filed. They were married during the taxable years in issue and filed joint Federal income tax returns.

I. Background on Petitioners and Strategica

Petitioner Jay Enis is a businessman, investor, and consultant. Mr. Enis earned his master's degree in finance from Long Island University and was involved in various business ventures throughout the course of his career. In 2000 petitioners moved from New Jersey to Florida where Mr. Enis focused on financing transactions and businesses. Through his business, Mr. Enis assisted in financing purchase orders that his clients were unable to finance themselves. In the following years Mr. Enis began working with Jack Burstein in a direct partnership alongside Mr. Burstein's merchant banking firm--Strategica Capital Associates, Inc. (Strategica). Other members of Strategica at the time of Mr. Enis' involvement were Steven Cook and Scott Kranz.

**[*4]** II.  <u>NLS</u>

NLS is a Florida S corporation founded by Mark Ginsburg whose original shareholders were Dr. Ginsburg and his sister Ricki Robinson.[3]  NLS is a diagnostic laboratory supplying blood diagnostic testing to end-stage renal dialysis patients throughout the country.  In 2004 Dr. Ginsburg--NLS' chief executive officer--approached Mr. Enis to ask whether he would consider getting involved in NLS.  Subsequently, Dr. Ginsburg met with Mr. Enis and Mr. Burstein to discuss issues NLS was facing and its potential for diversification.  At the time Mr. Enis observed that NLS lacked a solid financial infrastructure.

III.  <u>Strategica's Investment in NLS</u>

Ultimately, on September 26, 2006, NLS entered into a Financial Advisory and Business Consulting Agreement (consulting agreement) with Strategica.  Under the consulting agreement, Strategica would provide the following services: Settling existing liabilities, diversifying the business, and implementing a financial infrastructure.  As consideration for these services, NLS would pay Strategica $60,000 per month.  Dr. Ginsburg and Dr. Robinson would own 50% of NLS, and

---

[3] One of petitioners' arguments is that NLS should be treated as a C corporation.  In the light of the parties' stipulation that NLS is properly treated as an S corporation, we will not address petitioners' contrary argument that NLS is a C corporation.  <u>See</u> Rule 91(e) (stipulations are treated generally as conclusive admissions); <u>see also</u> <u>Stamos v. Commissioner</u>, 87 T.C. 1451, 1454 (1986).

[*5] members of Strategica or their designees (Strategica Group shareholders) would own the other 50%. Mr. Enis and Mr. Burstein agreed that Mrs. Enis would receive 50% of the Strategica Group shareholders' shares of NLS and the remainder would be divided among Gilda Burstein, Mr. Cook, and Mr. Kranz.

On January 31, 2007, the shareholders of NLS executed a Shareholders Agreement. The shareholders agreement named Dr. Ginsburg as president, Dr. Robinson as executive vice president and secretary, Mr. Burstein as chairman, and Mr. Enis as vice president and treasurer. The board of directors consisted of the officers of the corporation--Dr. Ginsburg, Dr. Robinson, Mr. Burstein, and Mr. Enis. Section 10.3 of the shareholders agreement stated that "[a]ll matters relating to the management of the Corporation's business and operations of any kind or nature whatsoever shall be approved by a majority vote of Corporation's Board of Directors." The board of directors, however, met only once after executing the shareholders agreement.

The shareholders agreement further stated:

The timing and amount of any distributions of net profits or cash flow from the Corporation's operations or otherwise (the "Distributions") to be made by the Corporation to the Shareholders hereunder shall be approved by the Board of Directors in accordance with Section 10.3 hereof. All Distributions shall be made by the Corporation to the Shareholders pari passu in accordance with their proportionate Share ownership hereunder.

[*6] Section 10.8 of the shareholders agreement implemented a new payment approval procedure for NLS, stating:

> The authorizing resolution to be delivered to the bank or other depository of funds of the Corporation shall provide that any officer signing singly may execute all checks or drafts of the Corporation in an amount up to $100,000.00, and two (2) persons consisting of GINSBURG and one (1) member of the Strategica Group, shall be authorized as joint signatories in respect of all checks or drafts on behalf of the Corporation in excess of $100,000.00.

Nevertheless, NLS frequently made payments in excess of $100,000 that were not authorized in conformity with section 10.8 of the shareholders agreement.

The shareholders also were given the right to inspect and copy all books and records of NLS. At the beginning of Strategica's relationship with NLS, David Gartner--NLS' chief financial officer--distributed copies of monthly financial statements to Mr. Cook and Mr. Burstein. One concern raised by NLS' financial statements involved a loan from Dr. Ginsburg to NLS close to the time of its organization. General ledgers made available initially to the Strategica Group shareholders, and reviewed by Mr. Cook as part of Strategica's due diligence, showed a loan balance in excess of $7 million. Money paid by NLS on Dr. Ginsburg's behalf, including personal expenses, was charged against the loan, reducing the loan balance. Interest on the loan was paid to Dr. Ginsburg monthly until a bankruptcy trustee stopped payments.

**[\*7]**  NLS' financial statements were audited through the 2009 tax year.  For the 2008 and 2009 tax years, payments made from NLS to Dr. Ginsburg were recorded on the loan payable's general ledger account, and the loan appeared as a "Note Payable" on the audited financial statements, and appeared as "Liabilities" on the corporation's Federal income tax returns.  The loan payments were not reported as a "Loan from Shareholder" on Schedules L, Transactions With Interested Persons, of NLS' 2008 and 2009 Federal income tax returns.

IV.  Deterioration of the NLS-Strategica Relationship

Beginning in 2009 Dr. Ginsburg's relationship with Strategica and the Strategica Group shareholders began to deteriorate.  Mr. Enis approached Dr. Ginsburg concerning certain NLS expenses that Mr. Enis believed were personal and unrelated to diagnostic blood testing, money spent on ancillary business ventures, and Dr. Ginsburg's mistreatment of employees.  Mr. Enis also took issue with Dr. Ginsburg's prioritizing personal financial obligations over those of NLS.

At some point in 2009 members of Strategica and the Strategica Group shareholders were not permitted to enter NLS' premises.  Dr. Ginsburg instructed Mr. Gartner to stop providing financial information to Strategica and the Strategica Group shareholders.  In April 2009 NLS stopped paying Strategica for consulting services.

**[*8]** Dr. Ginsburg's financial dealings with NLS were not reported to the police, nor was Dr. Ginsburg criminally charged in connection with them.

V.  Lawsuits and Bankruptcy

On April 9, 2009, Dr. Ginsburg filed a complaint seeking judgment against NLS for the loans he claimed to have made to NLS from approximately 1995 through approximately 2008.  The Strategica Group shareholders were not aware of the lawsuit.  Dr. Ginsburg served the complaint on Tom Mann, the comptroller of NLS.  NLS did not defend this lawsuit, and a default judgment was entered against NLS for failure to answer.

On August 21, 2009, Strategica sued Dr. Ginsburg in State court for breach of the consulting agreement and failure to pay consulting fees and expenses.  On February 9, 2010, Dr. Ginsburg filed for chapter 11 bankruptcy in the Bankruptcy Court for the Southern District of Florida.  On February 12, 2010, Dr. Ginsburg filed a notice of removal, removing Strategica's lawsuit to Federal bankruptcy court.  On March 19, 2010, the Strategica Group shareholders filed an Emergency Motion for Relief from Automatic Stay to Seek Appointment of Receiver for and Judicial Dissolution of NLS.  On May 25, 2010, the Strategica Group shareholders filed a proof of claim in Dr. Ginsburg's bankruptcy proceeding.  The bankruptcy court appointed Soneet Kapila--a forensic accountant--to investigate NLS'

**[*9]** business operations. Mr. Kapila's report issued July 9, 2010, determined that the transfers of funds to Dr. Ginsburg disputed by Strategica and the Strategica Group shareholders were recorded on the books by NLS as loan repayments. The Strategica Group shareholders did not learn about the default judgment that Dr. Ginsburg obtained against NLS until approximately 2010 through bankruptcy disclosure schedules.

As a result of Mr. Kapila's findings, the bankruptcy court appointed United States bankruptcy trustee Ken Welt as a financial overseer of Dr. Ginsburg's activities at NLS. Mr. Welt was responsible for evaluating the financial status of NLS, taking financial control, and reporting his findings to the bankruptcy court. During Mr. Welt's time with NLS, payments of expenses or transfers of funds could not be accomplished without his approval. Additionally, Mr. Welt provided to shareholders monthly financial reports indicating the amounts of revenues and expenses. Mr. Welt at trial also recalled preparing a balance sheet that was made available only to Dr. Ginsburg and Dr. Robinson.

Mrs. Enis ultimately sold her NLS shares in 2014 for $436,165.

VI. Petitioners' Income Tax Returns

Petitioners' joint 2007 Form 1040, U.S. Individual Income Tax Return, was due on October 15, 2008, but they filed it on December 24, 2009. Similarly,

[*10] petitioners' joint 2010 Form 1040 was due on October 15, 2011, but they filed it on June 19, 2012. Petitioners employed the firm of Krevat & Krevat to prepare their 2007 and 2010 returns until the return preparer's illness forced them to transition to another return preparer.

Petitioners attached to their 2010 Form 1040 a Form 8082, Notice of Inconsistent Treatment or Administrative Adjustment Request. Petitioners' Form 8082 included the following statement pertaining to their ownership interest in NLS:

> The above entity * * * [NLS] * * * has initiated litigation against the taxpayer retroactively contesting the taxpayer's ownership interest. The entity and certain shareholders have prevented the taxpayer from exercising their [sic] shareholder rights including: sale of shares, voting on business matters, exercising dominion and control of the ownership interest, or enjoying any economic benefits or other ownership rights. The referenced Schedule K-1 is inconsistent with the entity's contention that the taxpayer is not entitled to any ownership interest. Therefore until legal ownership is resolved by the court, it was improper for the controlling shareholders to issue a Schedule K-1 to the taxpayer, and those amounts are not reported in this return.

VII. Partnership Returns and Discovery Issue

On July 13, 2004, Mr. Enis formed SEI--a limited liability company--in Florida. SEI was treated as a partnership for tax purposes. Mr. Enis formed SEI to isolate investments in which Mrs. Enis was directly involved. Mrs. Enis held

**[*11]** her interests in various partnerships through SEI. During the years in issue Mrs. Enis was a 99% stakeholder and Mr. Enis was a 1% stakeholder of SEI. On their 2010 Form 1040, petitioners claimed on Schedule E, Supplemental Income and Loss, a flow-through loss of $140,809 with respect to their interest in SEI. Respondent disallowed petitioners' claimed loss on Schedule E, asserting that petitioners failed to establish their bases in SEI.

On their 2010 Form 1040, petitioners also claimed an NOL carryforward deduction of $2,478,487 which respondent disallowed. In their amended petition petitioners asserted that they were entitled to NOL carryforward and carryback deductions for the 2007 and 2010 tax years.

A. Partnership Returns

To substantiate their entitlement to the NOL carryforward and carryback deductions, petitioners provided either Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., or Forms 1065, U.S. Return of Partnership Income, or both, for the following entities in which SEI was a partner:

| Year | Entity | Schedule K-1 | Form 1065 |
|------|--------|--------------|-----------|
| 2005 | SWP Palm Beach, LLC | Yes | Yes |
| 2006 | SWP Palm Beach, LLC | Yes | Yes |
| 2007 | Doctorschoice-Jacksonville | Yes | No |

| [*12] 2007 | Halifax Health Services | Yes | No |
|---|---|---|---|
| 2007 | SWP Palm Beach, LLC | Yes | Yes |
| 2008 | Doctorschoice-Jacksonville | Yes | No |
| 2008 | Halifax Health Services | Yes | No |
| 2008 | SWP Palm Beach, LLC | Yes | Yes |
| 2009 | Doctorschoice-Jacksonville | Yes | No |
| 2009 | Halifax Health Services | Yes | No |
| 2009 | SWP Palm Beach, LLC | Yes | Yes |
| 2010 | Doctorschoice-Jacksonville | Yes | No |
| 2010 | Halifax Health Services | Yes | No |
| 2010 | SWP Palm Beach, LLC | Yes | Yes |
| 2011 | Doctorschoice-Jacksonville | Yes | No |
| 2011 | Halifax Health Services | Yes | No |
| 2011 | SWP Palm Beach, LLC | Yes | Yes |
| 2012 | SWP Palm Beach, LLC | Yes | Yes |
| 2013 | SWP Palm Beach, LLC | Yes | Yes |
| 2014 | SWP Palm Beach, LLC | Yes | No |

B.  Discovery Issue

The Court's standing pretrial order, issued August 21, 2015, ordered "that any documents or materials which a party expects to use (except solely for impeachment) if the case is tried, but which are not stipulated, shall be identified

**[\*13]** in writing and exchanged by the parties at least 14 days before the first day of the trial session."

On August 27, 2015, respondent filed a motion to compel production of documents after petitioners failed to produce requested documents in response to respondent's informal discovery request sent on May 12, 2015, and respondent's request for production of documents served on July 20, 2015. The discovery requests and motion to compel sought, among other documents, "[a]ll Forms K-1 reflecting deductions and/or losses that comprise * * * [the] * * * net operating loss carryforwards and carrybacks" petitioners claimed and "[a]ll income tax returns for the entities generating such losses". Respondent also sought documents showing that petitioners had sufficient bases to deduct the NOLs, and evidence concerning the "at risk" rules under section 465 and passive loss limitations under section 469. On September 25, 2015, petitioners responded that "[a]ll documents called for in Respondent's Motion to Compel that Respondents [sic] have access to after exercising due diligence have now been turned over to Respondent."

On October 15, 2015, respondent replied, as ordered, to petitioners' response, stating that petitioners still had failed to produce documents relating to their entitlement to NOL deductions for 2007 and 2010, including Schedules K-1

**[*14]** and income tax returns for the entities generating those losses.  On October 23, 2015, we issued an order directing petitioners to file a response by November 24, 2015, representing that they have produced to respondent all requested documents in their possession or under their control.  We also advised the parties that we

> may exclude from evidence at trial documents that petitioner seeks to introduce that are responsive to paragraph 5 of respondent's request for production of documents * * * [--relating to petitioners' claimed NOLs--] * * * if those documents were not produced to respondent prior to the date of this Order, absent a showing by petitioners that these documents came into petitioners' possession or control after the date of this Order and were produced to respondent within five days of discovery and no later than 14 days prior to the date of trial, as directed by our Standing Pretrial Order entered on August 21, 2015.

Petitioners failed to file a response to our order.

Petitioners ultimately produced documents relating to respondent's request, including the Schedules K-1 and Forms 1065 listed supra part VII.A., two and one business days before the calendar call for the trial session.

OPINION

I.  Burden of Proof

Ordinarily, the taxpayer bears the burden of proving that the Commissioner's determinations are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Deductions are a matter of legislative grace, and

**[\*15]** taxpayers bear the burden of proving entitlement to the deductions claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers must maintain sufficient records to substantiate any deductions claimed. Sec. 6001.

II. Shareholder Status

We first must determine whether Mrs. Enis remained a shareholder in NLS during the years in issue. Section 1366(a)(1) provides that shareholders of an S corporation shall take into account their pro rata shares of the S corporation's income, loss, deductions, and credits for the S corporation's taxable year ending with or in the shareholders' taxable year. An S corporation's shareholders must take into account the S corporation's income regardless of whether any income is distributed. See Dunne v. Commissioner, T.C. Memo. 2008-63, 2008 WL 656496; Chen v. Commissioner, T.C. Memo. 2006-160.

In determining stock ownership for Federal income tax purposes, the Court must look to the beneficial ownership of shares, not mere legal title. See Ragghianti v. Commissioner, 71 T.C. 346, 349 (1978), aff'd, 652 F.2d 65 (9th Cir. 1981). Cases concluding that a shareholder did not have beneficial ownership have considered both agreements between shareholders that removed ownership and provisions in the corporation's governing articles affecting ownership rights.

[*16] See Dunne v. Commissioner, 2008 WL 656496, at *9. Mere interference with a "shareholder's participation in the corporation as a result of a poor relationship between the shareholders * * * does not amount to a deprivation of the economic benefit of the shares." Id. (citing Hightower v. Commissioner, T.C. Memo. 2005-274, aff'd without published opinion, 266 F. App'x 646 (9th Cir. 2008)); Kumar v. Commissioner, T.C. Memo. 2013-184.

Petitioners contend that while Mrs. Enis was issued NLS shares, the removal of her power to exercise shareholder rights, as well as the actions of Dr. Ginsburg, removed the beneficial ownership of her shares. Petitioners, therefore, assert that they are not required to include pro rata shares of NLS' income. Petitioners identified no agreement or provisions in the corporation's governing articles removing beneficial ownership. Kumar does not support their position that a violation of the shareholders agreement could deprive them of the beneficial ownership of their shares. In Kumar we found that in the absence of an agreement passing the taxpayer's rights to his stock to another shareholder, a poor relationship between shareholders does not deprive one shareholder of the economic benefit of his shares. Kumar v. Commissioner, at *3. We, therefore, held that the taxpayer retained beneficial ownership. Id.

**[\*17]** Further, petitioners cited no authority, nor are we aware of any, that allows shareholders to exclude their shares of an S corporation's income because of poor relationships with other shareholders. While the relationships among the shareholders of NLS deteriorated, those poor relationships did not deprive Mrs. Enis of the economic benefit of her NLS shares. Indeed, ultimately, she sold her shares in 2014 for $436,165.

As Mrs. Enis remained a shareholder of NLS for the tax years in issue, petitioners must include her pro rata share of NLS income.

## III. Theft Loss Deduction

Petitioners also allege that they are entitled to a section 165 theft loss deduction as shareholders of NLS, under section 1366(a)(1). Section 165(a) permits a taxpayer to deduct against ordinary income "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(e) provides that "[f]or purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." A theft, for purposes of section 165(e), is broadly defined to include larceny, embezzlement, and robbery. Sec. 1.165-8(d), Income Tax Regs. Further, shareholders of an S corporation shall take into account their pro rata

[*18] shares of the S corporation's deductions for its taxable year. Sec.

1366(a)(1). Therefore, petitioners must establish that NLS is entitled to a theft

loss deduction.

Generally, to substantiate a theft loss deduction, the taxpayer must prove

both that a theft actually occurred under the law of the relevant State and the

amount of the loss. See Nichols v. Commissioner, 43 T.C. 842, 884-885 (1965).

The taxpayer also may prove theft under an applicable Federal criminal statute.

See id. at 884-885; Sheridan v. Commissioner, T.C. Memo. 2015-25, at *7-*8.

The taxpayer must prove by a preponderance of the evidence that the theft

occurred. See Allen v. Commissioner, 16 T.C. 163, 166 (1951) ("If the reasonable

inferences from the evidence point to theft, the proponent is entitled to prevail. If

the contrary be true and reasonable inferences point to another conclusion, the

proponent must fail.").[4]

---

[4] Petitioners assert that they have provided complete and conclusive
documentation and credible testimony to substantiate a theft loss sufficiently to
shift the burden of proof under sec. 7491(a). Under sec. 7491(a)(1), "[i]f, in any
court proceeding, a taxpayer introduces credible evidence with respect to any
factual issue relevant to ascertaining the liability of the taxpayer for any tax
imposed by subtitle A or B, the Secretary shall have the burden of proof with
respect to such issue." See Higbee v. Commissioner, 116 T.C. 438, 442 (2001)
("Credible evidence is the quality of evidence which, after critical analysis, the
court would find sufficient upon which to base a decision on the issue if no
contrary evidence were submitted (without regard to the judicial presumption of

(continued...)

**[\*19]** As petitioners allege that Dr. Ginsburg committed a theft from NLS in Florida, Florida law applies. Under Florida law,

> A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:

> (a) Deprive the other person of a right to the property or a benefit from the property.

> (b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.

Fla. Stat. Ann. sec. 812.014(1) (West 2011). A person "obtains or uses" property by either "[t]aking or exercising control," "[m]aking any unauthorized use, disposition or transfer," obtaining the property "by fraud, willful misrepresentation of a future act, or false promise," or engaging in conduct previously known as embezzlement or other conduct similar in nature. Id. sec. 812.012(3).

Petitioners assert that a theft under Florida law occurs where individuals use corporate funds for personal purposes without the assent or knowledge of other shareholders, citing United States v. Falcone, 934 F.2d 1528 (11th Cir. 1991),

---

⁴(...continued)
IRS correctness)." (quoting H. Conf. Rept. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995)). The resolution of this issue, however, does not depend on which party has the burden of proof. We resolve it based on a preponderance of the evidence in the record. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008); Schank v. Commissioner, T.C. Memo. 2015-235, at \*16.

[*20] reh'g granted & opinion vacated, 939 F.2d 1455 (11th Cir. 1991), opinion restated on reh'g, 960 F.2d 988 (11th Cir. 1992) (en banc).  But in Falcone, the U.S. Court of Appeals for the Eleventh Circuit affirmed the convictions, under Federal law, of individuals who deceived banks into releasing funds by making false representations.  Id. at 1548.

Petitioners have failed to prove that Dr. Ginsburg committed a theft under Florida law or applicable Federal criminal statutes.  We are unable to conclude that Dr. Ginsburg had the requisite intent to commit a theft against NLS solely on the evidence that Dr. Ginsburg used corporate funds for personal expenses.  Dr. Ginsburg concealed neither his loan to NLS nor the subsequent payments made against the loan.  The loan was recorded in the corporation's financial statements, which were made available to the Strategica Group shareholders at the time they acquired their interests and at least until 2009.  Likewise, the payments at issue were recorded as loan repayments on the loan payable's general ledger account, which also was available, at least initially, to the Strategica Group shareholders.  While certain of Dr. Ginbsurg's actions might have been against the interest of the Strategica Group shareholders, and might have violated the shareholders agreement, they do not constitute a theft for purposes of section 165.

**[\*21]** We hold, therefore, that petitioners are not entitled to a theft loss deduction under section 165.

IV. SEI Loss

A deduction for a partner's distributive share of partnership losses is allowed only to the extent of the adjusted basis of the partner's interest in the partnership at the end of the partnership year in which such loss occurred. Sec. 704(d). Petitioners must prove that they had sufficient outside bases to deduct their distributive shares of SEI losses. See Powers v. Commissioner, T.C. Memo. 2013-134, at \*10. This determination of a partner's basis in his or her partnership interest must be made before a partner can deduct his or her share of partnership losses because losses cannot reduce a partner's basis below zero. See sec. 704(d); Sennett v. Commissioner, 80 T.C. 825, 829 (1983), aff'd, 752 F.2d 428 (9th Cir. 1985). Further, "[p]roof of basis is a specific fact which the taxpayer has the burden of proving." O'Neill v. Commissioner, 271 F.2d 44, 50 (9th Cir. 1959), aff'g T.C. Memo. 1957-193. Thus, for petitioners to prove that they were entitled to deduct the loss disallowed by respondent, they must establish, with specificity, their bases in SEI. See sec. 704(d); O'Neill v. Commissioner, 271 F.2d 44 at 50.

**[\*22]** Respondent contends that petitioners have failed to establish that they had sufficient bases to deduct a $140,809 Schedule E loss from SEI for the 2010 taxable year. Petitioners argue that they have sufficient bases, asserting that the schedule of expenses on their 2010 return is the primary evidence of the expenses underlying the loss deduction claimed. Petitioners also assert in their final answering brief that SEI's 2010 "return contains a schedule of Line 20 other expenses which is the primary determinant of the expenses and includes $147,489 of legal and professional expense deductions." They claimed that, "[i]n total Petitioners paid [the] Bilzin [law firm] $376,470 and paid three other law firms additional fees." Other than the tax returns we described above, petitioners provided no evidence supporting their contention. Their (and SEI's) tax returns do not constitute proof of basis. See Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979) (citing Roberts v. Commissioner, 62 T.C. 834, 837, 839 (1974)) (finding that taxpayers cannot rely solely on their own income tax returns to substantiate deductions). Petitioners' evidence is simply insufficient to establish basis amounts for their interests in SEI.

As petitioners have failed to establish that they had sufficient bases to deduct the partnership loss from SEI reported on their 2010 return, they are not permitted to deduct the loss.

**[\*23]** V.  <u>Petitioners' Violation of the Standing Pretrial Order</u>

The standing pretrial order issued to the parties on August 21, 2015, set forth two requirements relevant to the evidentiary ruling we must make:  (1) that the parties enter into a stipulation of facts to be submitted at the start of trial, if the case could not be settled, in which "[a]ll documents and written evidence shall be marked and stipulated in accordance with Rule 91(b)"; and (2) that "any documents or materials which a party expects to use * * *, but which are not stipulated, shall be identified in writing and exchanged by the parties at least 14 days before the first day of the trial session."  The standing pretrial order also advised the parties that "the Court may refuse to receive in evidence any document or material that is not so stipulated or exchanged, unless the parties have agreed otherwise or the Court so allows for good cause shown."  The notice setting this case for trial, also issued to the parties on August 21, 2015, referred the parties to the standing pretrial order.

Rule 131(b) states that failure to comply with a standing pretrial order may subject a party to sanctions.  The standing pretrial order warns that one possible sanction for violating the 14-day rule is the exclusion of evidence that was not exchanged in accordance with that requirement.  <u>Moretti v. Commissioner</u>, 77 F.3d 637, 644 (2d Cir. 1996) (affirming a Tax Court ruling excluding from

[*24] evidence documents that the taxpayers untimely produced in violation of the pretrial order).  The 14-day rule is intended to allow the opposing party the opportunity to review evidence to prepare any challenge or rebuttal.  Kornhauser v. Commissioner, T.C. Memo. 2013-230, at *9 n.4 (citing Dunn v. Commissioner, T.C. Memo. 1988-45), aff'd, 632 F. App'x 421 (9th Cir. 2016); see Rodriguez v. Commissioner, T.C. Memo. 2017-173.  "[T]he rule prevents an 'ambush' with last-minute evidence that could have been presented to the opposing party during preparation for trial."  Kornhauser v. Commissioner, at *9 n.4.

In weighing the appropriate sanction for violation of the 14-day rule, the Court considers whether the opposing party was prejudiced by the failure.  See Thompson v. Commissioner, T.C. Memo. 2011-291, 2011 WL 6382704, at *2 n.8; Morris v. Commissioner, T.C. Memo. 2008-65, 2008 WL 704208, at *1, aff'd, 431 F. App'x 535 (9th Cir. 2011).  In Morris v. Commissioner, 2008 WL 704208, at *1 for example, we concluded that the Commissioner was prejudiced because the taxpayer's records were discovered at trial to be full of errors and the Commissioner had insufficient time to review the proffered documents.  We recently reached the same conclusion in Rodriguez v. Commissioner, T.C. Memo. 2017-173, with respect to documents produced at the calendar call.

**[\*25]** We also consider why a party failed to comply with the standing pretrial order, and absent good cause, we do not hesitate to enforce the 14-day rule. See Kaplan v. Commissioner, T.C. Memo. 2016-149, at \*9-\*10; see, e.g., Cebollero v. Commissioner, T.C. Memo. 1990-618 (excluding the taxpayer's expert witness testimony as identification of the witness was not proffered in compliance with the pretrial order), aff'd, 967 F.2d 986 (4th Cir. 1992).

Petitioners' production of documents two and one business days before the calendar call for the trial session was in violation of the 14-day rule. When asked why these documents were produced so late, Mr. Enis testified that he operates out of his home office, without secretaries, and "ostensibly" did not own a computer until three years before the trial. He explained that he manually filed documents in boxes and sent them out to his tax preparers. Mr. Enis further testified that "I'm one guy and I'm being inundated with requests for more and more documents and I frankly, it took me a great deal of time". Mr. Enis explained that he had to identify and contact various accountants who had the relevant documents, a time-consuming process. Finally, he testified that the day he ultimately received the documents, he forwarded them to his attorney.

Petitioners' excuses for their late production do not amount to a showing of good cause, especially after respondent filed a motion to compel over four months

**[\*26]** before trial to which petitioners responded, over three months before trial, that "[a]ll documents called for in the Respondent's Motion to Compel that Respondents [sic] have access to after exercising due diligence have now been turned over to Respondent." From Mr. Enis' testimony, we conclude that he undertook to find the documents only as the trial date drew near, which was well after petitioners' representation that all documents called for in respondent's motion to compel, to which they had access "after exercising due diligence", were turned over. That Mr. Enis had to contact others (his accountants) does not excuse his delay. Petitioners' untimely production of documents prejudiced respondent as counsel lacked sufficient time to review the documents and verify the status of the returns. Petitioners also failed to show that the late-produced Schedules K-1 and Forms 1065 were actually filed.

We find that petitioners failed to demonstrate good cause. Petitioners were on notice that respondent sought this information several months before trial. We, therefore, will exclude these documents. We also cannot overlook their failure to respond to our order. Mr. Enis is a savvy businessman represented by counsel. He should be well aware of the consequences for failure to comply with a court order.

[*27] VI. <u>NOL Carryforward and Carryback Deductions</u>

Section 172 allows a taxpayer to deduct NOLs for a taxable year. The amount of the NOL deduction equals the aggregate of the NOL carryforwards and NOL carrybacks to the taxable year. Sec. 172(a). Section 172(c) defines an NOL as the excess of deductions over gross income, computed with certain modifications specified in section 172(d). Absent an election under section 172(b)(3), an NOL for any taxable year first must be carried back 2 years and then carried over 20 years. Sec. 172(b)(1)(A), (2) and (3).

The NOL deduction is a matter of legislative grace; it is not an automatic right. See <u>Power v. Commissioner</u>, T.C. Memo. 2016-157, at *13 (citing <u>United States v. Olympic Radio & Television, Inc.</u>, 349 U.S. 232, 235 (1955)). Petitioners bear the burden of establishing both the existence of NOLs and the amounts that may be carried forward or back to the taxable years in issue. See Rule 142(a); <u>Keith v. Commissioner</u>, 115 T.C. 605, 621 (2000). Specifically, a taxpayer must prove that (1) her entity incurred NOLs, (2) she had a sufficient basis in her entity in the years the NOLs were incurred, (3) no other limitations applied to her realization of the NOLs, and (4) the NOLs were properly carried forward and/or back to the years in issue. See <u>Jasperson v. Commissioner</u>, T.C. Memo. 2015-186, at *8 (citing <u>Philpott v. Commissioner</u>, T.C. Memo. 2012-307,

[*28] and Miller v. Commissioner, T.C. Memo. 2006-125), aff'd, 658 F. App'x 962 (11th Cir. 2016). Further, taxpayers cannot rely solely on their own income tax returns to establish the losses they sustained. See Wilkinson v. Commissioner, 71 T.C. at 639; see also Power v. Commissioner, at *5.

Petitioners rely on their Forms 1040, as well as the Forms 1065 and Schedules K-1 for entities in which SEI was a partner, to substantiate their losses. We excluded these late-produced documents from evidence. Petitioners have not produced any other evidence to show that they are entitled to deduct the NOLs purportedly incurred. We find, therefore, that they are not entitled to NOLs for the taxable years in issue.

VII. Additions to Tax

Finally, the Commissioner bears the burden of production with respect to a taxpayer's liability for additions to tax. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the Commissioner satisfies the burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer has an affirmative defense such as reasonable cause. See id. at 446-447.

Respondent determined that petitioners are liable for the section 6651(a)(1) addition to tax for 2007 and 2010 because both returns were filed after their

[*29] respective deadlines.  Section 6651(a)(1) authorizes the imposition of an addition to tax for failure to file a return timely unless it is shown that the failure is due to reasonable cause and not due to willful neglect.  See United States v. Boyle, 469 U.S. 241, 245 (1985).  Whether a taxpayer has "reasonable cause" within the meaning of section 6651(a)(1) depends on whether the taxpayer exercised "ordinary business care and prudence" but was nevertheless unable to file the return within the prescribed time.  Id. at 246; sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

Petitioners explained that they filed their returns late because of their return preparer's illness and their subsequent transition to a different return preparer.  Their reliance on their paid tax preparers does not constitute reasonable cause.  It is well established that "[t]he failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and this reliance is not 'reasonable cause' for a late filing under * * * [section] * * * 6651(a)(1)."  See Boyle, 469 U.S. at 252.  Petitioners further assert that late-filing additions to tax were paid previously.

We hold that petitioners are liable for additions to tax under section 6651(a)(1) for the 2007 and 2010 tax years.  Petitioners did not show payments of any late-filing additions to tax for 2007 or 2010, but we assume any such

**[*30]** payments will be reflected in their transcripts and credited against the additions to tax in our decision before assessment.

We have considered all arguments made and facts presented in reaching our decision, and, to the extent not discussed above, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered under

Rule 155.